# United States District Court

## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| STONECOAT OF TEXAS, LLC,<br>STONECOAT GP, LLC, and<br>STONECOAT LP<br>    Plaintiffs/Counter-Defendants | §<br>§<br>§<br>§<br>§ | |
| V. | §<br>§ | Civil Action No. 4:17CV303<br>Judge Mazzant/Magistrate Judge Craven |
| PROCAL STONE DESIGN, LLC,<br>PROCAL STONE DESIGN USA, LLC,<br>PROCAL ENTERPRISES, LLC, JOHN<br>PROFANCHIK, SR., JUSTIN KINSER,<br>IRMA VILLARREAL, ALFREDO<br>GONZALEZ, PHILIPPE MERGAUX,<br>and PIERRE-LAURENT CHAMIELEC<br>    Defendants/Counter-Plaintiffs | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| V. | §<br>§<br>§ | |
| THE MORRISON FAMILY TRUST and<br>KENNETH W. MORRISON,<br>Individually and in his capacity as<br>Trustee<br>    Third-Party Defendants | §<br>§<br>§<br>§<br>§<br>§ | |

## ORDER ADOPTING REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE REGARDING
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The above-entitled and numbered civil action was heretofore referred to United States

Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. On August 12, 2019, the

Magistrate Judge issued a Report and Recommendation, recommending the following motions be

granted: (1) John Profanchik, Sr.'s Motion for Summary Judgment (regarding StoneCoat GP's and

StoneCoat LP's remaining claims against him) (Dkt. #67); (2) Irma Villarreal and Alfredo

Gonzalez's Motion for Summary Judgment (Dkt. #127); (3) Justin Kinser's Motion for Summary

Judgment (Dkt. #128); (4) ProCal Stone Design, LLC's Motion for Summary Judgment (Dkt. #129); and (5) ProCal Stone Design USA, LLC and ProCal Enterprises, LLC's Motion for Summary Judgment (Dkt. #195). Specifically, the Magistrate Judge recommends StoneCoat GP's and StoneCoat LP's remaining claims against Profanchik be dismissed with prejudice,[1] and Plaintiffs' claims against the remaining defendants be dismissed with prejudice.

Plaintiffs-counterdefendants StoneCoat of Texas, LLC ("SCOT"), StoneCoat GP, LLC ("StoneCoat GP"), and StoneCoat, LP ("StoneCoat LP") (collectively, "Plaintiffs") filed objections to the Report and Recommendation. The Court conducts a *de novo* review of the Magistrate Judge's findings and conclusions.

## BACKGROUND

**Plaintiffs-counterdefendants' claims**

In May 2017, Plaintiffs filed this case against defendants-counterplaintiffs ProCal Stone Design, LLC ("ProCal Stone Design"), John D. Profanchik, Sr. ("Profanchik"), Justin Kinser ("Kinser"), Irma Villarreal ("Villarreal"), Alfredo Gonzalez ("Gonzalez"), Philippe Mergaux ("Mergaux"), and Pierre-Laurent Chamielec ("Chamielec"). ProCal Stone Design, US LLC ("ProCal USA") and ProCal Enterprises, LLC ("ProCal Enterprises") (together with ProCal Stone Design, "ProCal") were later added as defendants.

Plaintiffs allege the following claims against the ProCal entities, Profanchik, Kinser,

---

[1] On July 25, 2019, the Magistrate Judge entered a Report and Recommendation of the Magistrate Judge Regarding Profanchik's Motion for SJ on Res Judicata. Dkt. #234. The Magistrate Judge recommended SCOT's claims against Profanchik be dismissed and that StoneCoat GP's and StoneCoat LP's claim for breach of fiduciary duty against Profanchik be dismissed. The Magistrate Judge advised the parties all other claims of StoneCoat GP and StoneCoat LP against Profanchik would be addressed in this separate Report and Recommendation on the remaining defendants' motions for summary judgment.

On August 20, 2019, the undersigned adopted the July 25 Report and Recommendation as the findings and conclusions of the Court. Dkt. #252.

Villarreal, Gonzalez, Mergaux, and Chamielec:[2] violations of the Lanham Act, 15 U.S.C. § 1125(a), and Defend Trade Secrets Act of 2016, Public Law 114-153 (May 11, 2016); common law and statutory misappropriation of trade secrets; breach of nondisclosure and noncompete contractual covenants; conversion; violation of the Texas Theft Liability Act; tortious interference with exiting contractual relationships; unfair competition; civil conspiracy; assisting and encouraging, concert of action by Defendants; joint enterprise by Defendants; and declaratory relief under the Declaratory Judgment Act, 28 U.S.C § 2201.

Among other things, Plaintiffs allege Profanchik executed a non-disclosure/non-compete agreement in order to obtain, and did obtain, confidential and proprietary information and trade secrets of Plaintiffs in order to evaluate a possible purchase of Plaintiffs or an equity investment in Plaintiffs. According to Plaintiffs, Profanchik ultimately decided not to invest in Plaintiffs; "but, Profanchik, nevertheless, misappropriated Plaintiffs' confidential and proprietary information and trade secrets and used such information and trade secrets to form Procal and to unlawfully compete with Plaintiffs." Dkt. #103, ¶ 3. Profanchik formed or created the ProCal entities on various dates since May 7, 2015 and allegedly "used and transmitted to Procal misappropriated proprietary and confidential information and trade secrets of Plaintiffs to the Procal [entities] to enable them to unlawfully and unfairly compete against Plaintiffs." *Id.*, ¶ 4.

Plaintiffs allege Kinser, Villarreal, Gonzalez, Mergaux, and Chamielec all previously worked

---

[2] According to the parties' Joint Report of Rule 26(f) Conference, Chamielec is a French citizen who does not live or work in the United States. He has not been served in this lawsuit and is not represented by counsel for Defendants. Dkt. #30 at 1, n.1.

Following the filing of Defendant Mergaux's Suggestion of Bankruptcy and Notice of Stay, the Court issued an Order on March 20, 2018, staying all claims asserted in this case as to Defendant Mergaux only, pending further order of the Court. Dkt. #52.

with Plaintiffs prior to May 7, 2015 and had executed written agreements not to disclose Plaintiffs' confidential and propriety information and trade secrets; however, after May 7, 2015, they began working for ProCal and began unlawfully and unfairly using Plaintiffs' confidential and proprietary information and trade secrets while working for ProCal. *Id.*, ¶ 5.

Plaintiffs allege Profanchik and ProCal knew of the contractual agreements made by Kinser, Villarreal, Gonzalez, Mergaux, and Chamielec, but despite such knowledge, interfered with these contractual obligations. *Id.*, ¶ 6. Plaintiffs further allege ProCal "has and continues to falsely misrepresent its involvement in the industry and has falsely made claims that are known to be . . . literally false and that caused confusion in the marketplace regarding Procal's products, services, goods and workmanship." *Id.*, ¶ 7.

**Defendants' motions for summary judgment**

In five separate motions, Profanchik, Kinser, Villarreal, Gonzalez (together, "individual defendants"), and the ProCal entities (collectively, "Defendants") move the Court to grant summary judgment against the following claims asserted against them by Plaintiffs: (1) Lanham Act violations (Count 1); (2) misappropriation of trade secrets and theft/conversion (Counts 2-5); (3) breach of contract (Count 6); (4) breach of fiduciary duty (Count 7); (5) tortious interference (Count 8); (6) unfair competition (Count 9); (7) declaratory relief; (8) injunctive relief; and (9) damages.

As an overarching argument, Defendants assert all Plaintiffs' claims should be dismissed because Plaintiffs' damages calculations are flawed and without evidentiary support. Specifically regarding each claim, Defendants argue as follows:

First, Defendants assert Plaintiffs' Lanham Act claims fail as a matter of law. According to Defendants, the alleged violations fall into two categories – false advertising and trademark

infringement – and there is no evidence to support either claim.

Second, Defendants assert Plaintiffs' Misappropriation of Trade Secrets and Confidential and Proprietary Information (Count 2), Misappropriation of Trade Secrets and Confidential and Proprietary Information, United States Defend Trade Secrets Act of 2016 (Count 3), Conversion (Count 4), and Texas Theft Liability Act (Count 5) claims fail as a matter of law for the following reasons: (1) Plaintiffs do not have any trade secrets, (2) there is no evidence the individual defendants took Plaintiffs' trade secrets, and (3) there is no evidence the individual defendants are using Plaintiffs' trade secrets.

Third, Defendants assert Plaintiffs' Breach of Contract (Count 6) claim fails as a matter of law because there is not a valid contract and the statute of limitations expired before Plaintiffs brought this claim. According to Kinser, Villarreal, and Gonzalez, there was no consideration provided them when entering in the non-disclosure/non-compete agreements and those agreements contain unreasonable limitations. According to ProCal USA and ProCal Enterprises, they were not party to a contract with Plaintiffs.

Fourth, the ProCal entities move for summary judgment against Plaintiffs' claim for Breach of Fiduciary Duty (Count 7), asserting ProCal did not have a fiduciary relationship with Plaintiffs. Kinser, Villarreal, and Gonzalez also move for summary judgment as to this claim. Kinser argues he was not a fiduciary and the economic loss rule applies. Villarreal and Gonzalez argue there is no evidence they breached fiduciary duties to Plaintiffs.

Fifth, the ProCal entities argue Plaintiffs' Tortious Interference (Count 8) claim fails as a matter of law because there is not a valid contract to interfere with and the statute of limitations expired related to all contracts at issue before Plaintiffs brought this claim. ProCal Stone Design

further argues related entities cannot interfere with their own contracts. ProCal USA and ProCal Enterprises further argue they were not in existence at the time of the alleged interference.

Sixth, Defendants assert Plaintiffs' claim for Unfair Competition (Count 9) and all iterations of conspiracy fail as a matter of law because they are not an independent causes of action.

Seventh, Defendants assert Plaintiffs' claims for Declaratory Relief (Count 7) fail as a matter of law because those claims are redundant and such relief is not available in federal court.

Eighth, Defendants assert Plaintiffs' claims for Injunctive Relief fail as a matter of law.

## AUGUST 12, 2019 REPORT AND RECOMMENDATION

### Consideration of all the evidence of record

On August 12, 2019, the Magistrate Judge entered a 193-page Report and Recommendation ("R&R") regarding proposed findings of fact and recommendations that Defendants' motions for summary judgment be granted. Dkt. #241. The evidence relied upon by the Magistrate Judge is set forth in detail in the R&R and is not duplicated herein.[3] *Id.* at pp. 24-90.

### Consideration of Plaintiffs' Lanham Act claims (Count 1)

In her discussion of the Lanham Act trademark infringement claim, the Magistrate Judge considered whether there was sufficient evidence to show Defendants used or infringed the "Stonecoat" mark and concluded the evidence is insufficient to carry Plaintiffs' burden at the

---

[3] Even though the Court's Local Rules provide that proper summary judgment evidence should be attached to the parties' briefing in accordance with Local Rule CV-56(d) and further provide the Court is not obligated to "scour the record in an attempt to unearth an undesignated genuine issue of material fact," Local Rule CV-56(c), the Magistrate Judge advised the parties she considered the entire admissible record in this case, including the previous filings of both Plaintiffs and Defendants in the briefing on Profanchik's motion for summary judgment and Plaintiffs' and Morrison/MFT's motions for summary judgment. Dkt. #241 at p. 12, n. 6 (citing FED. R. CIV. P. 56 (c)(3) ("*Materials Not Cited*. The court need consider only the cited materials [filed with a motion for summary judgment or response], but it may consider other materials in the record.")).

summary judgment stage.[4] *Id.* at p. 98. She concluded the "record evidence is insufficient to create a genuine issue of material fact that Defendants, much less Kinser, Villarreal and Gonzalez, used in commerce any reproduction, counterfeit, copy, or colorable imitation of the 'Stonecoat' trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive." *Id.* at pp. 98-99.

She then considered Plaintiffs' false advertising Lanham Act claim, namely that Defendants have falsely stated in commercial advertising that Defendants "invented" sprayed limestone and have been in the sprayed vertical limestone business for "over 17 years." *Id.* at p. 100. Putting aside the fact Plaintiffs do not sufficiently distinguish the actions of each defendant, the Magistrate Judge considered whether Plaintiffs have produced sufficient evidence to create a genuine issue of material fact that any defendant made alleged false advertisements in interstate commerce. *Id.* at p. 105. The Magistrate Judge noted Plaintiffs had not submitted a specific advertisement (or even more informal type of promotion) for the Court's review, nor was there any evidence the alleged false advertisements were made in interstate commerce. *Id.* at pp. 105-08. The Magistrate Judge concluded Plaintiffs have not met their burden in showing the alleged false advertising statements

---

[4] The Magistrate Judge noted in the June 28, 2019 Order granting in part and denying in part Defendants' motions to strike various portions of Morrison's affidavit, the Court sustained Defendants' objections to ¶ 67 of Morrison's affidavit and attached Exhibit 10. Dkt. #225 at p. 32 ("Regarding Exhibit 10, there is no indicia that these photos actually came off the YouTube website. For example, there is not a YouTube logo or url header/footer listed on Exhibit 10. While there does appear to be a ProCal logo on the bottom of the photo, Defendants argue that could have been copied and pasted by anyone with minor computer skills. The Court agrees the lack of any identifying information related to where these photos originated makes them unreliable.").

According to the Magistrate Judge, the only other evidence regarding Plaintiffs' trademark infringement claim against Defendants are Morrison's conclusory statements in his updated affidavit that "Profanchik and Procal have misappropriated Stonecoat GP and Stonecoat LP's trademarks and have used those trademarks in the marketplace to promote and sell Profanchik's and Procal's products and services" and that they have "caused confusion in the marketplace regarding the products and services . . . promoted in the marketplace by Profanchik and Procal." R&R at p. 98 (quoting Morrison Aff., ¶ 65).

(that ProCal "invented" the vertical limestone product and that Procal had been in the vertical limestone business for "over 17 years") were sufficiently disseminated in interstate commerce nor have Plaintiffs sufficiently "evidenced the final element, likelihood of injury." *Id*. at p. 108. Thus, the Magistrate Judge recommended Defendants' motions for summary judgment regarding all of Plaintiffs' Lanham Act claims be granted. *Id.* at p. 109.

**Consideration of Plaintiffs' conversion and trade secret misappropriation claims (Counts 2-5)**

The Magistrate Judge then considered Plaintiffs' conversion claim, stating conversion does not apply to Defendants' alleged acts in connection with StoneCoat, which are more properly considered in relation to Plaintiffs' trade secret claims. *Id*. at pp. 111-12. After setting forth the applicable law regarding trade secrets and trade secret misappropriation, *id*. at pp. 112-17, the Magistrate Judge outlined Plaintiffs' misappropriation of trade secret allegations (included in Counts 2, 3 and 5 of the complaint), as well as the evidence relating to the existence of any trade secrets owned by Plaintiffs. *Id*. at pp. 117-25.

In the first specific issue, whether there is sufficient evidence Plaintiffs own(ed) a trade secret, the Magistrate Judge concluded that with the exception of the two formulas Plaintiffs claim ownership and use of during the relevant time (first, the limestone formula contained in SCOT's patent application and then the French formula described in the Product Rights Agreement), Plaintiffs failed to establish any other claimed trade secret exists and its value to StoneCoat as required under Texas law. *Id.* at p. 131. The Magistrate Judge stated Plaintiffs had not submitted evidence relating to the six factors that Texas law considers for trade secret status, and the evidence of record, including Morrison's affidavit, does not satisfy the six-part Restatement test. *Id*. at pp. 131-32.

Turning to the limestone formula, the Magistrate Judge stated that, unlike the other categories of alleged trade secrets, "there is some evidence in the record from which the Court can determine, pursuant to the relevant factors and in the context of the surrounding circumstances, that StoneCoat's limestone formula was a trade secret at the relevant time." *Id*. at 135. According to the Magistrate Judge, disputed issues of fact remain with respect to whether Plaintiffs took reasonable steps to protect the limestone formula, and the fact that SCOT may have included the limestone formula in its March 2015 patent application to the USPTO "does not diminish the secrecy of the material during the period before the USPTO approved the patent or published the application. *Id.* at pp. 136-37 (quoting *Innovatier, Inc. v. CardXX, Inc*., No. 08-CV-00273-PAB-KLM, 2011 WL 3293789, at *4 (D. Colo. Aug. 1, 2011)). The Magistrate Judge concluded there is a genuine issue of material fact whether the limestone formula constituted a trade secret before the patent application was published in September 2015. *Id*. at p. 138.

She then discussed the French formula and first concluded, based on the record before the Court, that the Final Judgment entered by the court in the Hopkins State Litigation did not, as a matter of law, prevent Plaintiffs from arguing that the French formula is a StoneCoat GP trade secret. *Id.* at p. 140. The Magistrate Judge noted there are no findings by the jury or the court in the Hopkins State Litigation regarding Mergaux's termination of the Product Rights Agreement or of the ownership of the French formula, and she also considered Plaintiffs' supplemental filings regarding the hearing with the bankruptcy court regarding a proposed settlement of Mergaux's appellate rights in the appeal of the Hopkins State Litigation.[5]   The Magistrate Judge concluded

[5] Plaintiffs have previously informed the Court that they have reached a settlement with Mergaux's bankruptcy trustee of Plaintiffs' appeal to the Dallas Court of Appeals from the Final Judgment of the district court in the Hopkins State Litigation.  Plaintiffs provided the Court with a copy of the proposed settlement agreement and revised settlement

"Plaintiffs have raised a fact issue as to whether the French formula should be accorded trade secret protection." *Id.* at pp. 140-41.

The Magistrate Judge then considered whether there is sufficient evidence Defendants acquired either trade secret through a breach of a confidential relationship or other improper means. She first concluded the evidence of record is insufficient to create a genuine issue of material fact that Villarreal or Gonzalez acquired or discovered (through improper means or otherwise) the limestone formula or the French formula, the only possible trade secrets at issue in this case. Therefore, the Magistrate Judge recommended Villarreal's and Gonzalez's motion for summary judgment on Counts 2-3 and 5 be granted. *Id*. at p. 145.

After concluding there are genuine issues of material fact with respect to whether both Profanchik and Kinser acquired or discovered the limestone formula and the French formula through improper means, *id*. at pp. 145-51, the Magistrate Judge considered whether there is sufficient evidence Profanchik (and by extension the ProCal entities) and Kinser use or used either formula. Regarding the limestone formula, the Magistrate Judge stated the relevant time period is between early 2015 and September 10, 2015, the date the patent application disclosing the limestone formula was published. *Id.* at 152. The issue before the Magistrate Judge was whether there is sufficient

agreement. *See* Dkt. #s 226 and 262. In their objections, Plaintiffs state the bankruptcy court for the United States District Court for the Northern District of Texas approved (in substantially the same form) the Revised Settlement Agreement between the bankruptcy trustee and Plaintiffs. Dkt. #265 at pp. 25-26.  According to Plaintiffs, the bankruptcy court announced in open court on August 26, 2019 that the court was approving the motion by the bankruptcy trustee to approve the Revised Settlement Agreement with Plaintiffs and ordered the parties to prepare a final order incorporating all agreements reached by all parties. *Id.* at p. 26, n. 11.

   Plaintiffs assert "[t]his settlement, now approved by the bankruptcy court, after entry of a formal order, will resolve the Dallas Court of Appeals case between Plaintiffs and Mergaux and remand the case to the District Court in the Hopkins State Litigation (the 116th Judicial District Court of Dallas County Texas) for entry of an Amended Final Judgment establishing StoneCoat GP's ownership of the French formula, the enforceability of the Product Rights Agreement and the invalidity of the December 12, 2012 Termination of Escrow Agreement and Release of Formula." Dkt. #265 at p. 26 (citing Dkt. #262-1 at 61-71).

evidence the individual defendants used the limestone formula prior to September 10, 2015 to set up a competing business. *Id*. at p. 153.

According to the Magistrate Judge, the "only evidence in the record of possible use of the limestone formula within the relevant time period is the evidence that Kinser and Gonzalez were creating samples of limestone mix in Kinser's backyard and that by September 2015 Kinser was already 'blowing stone' in the showroom that would later be utilized by ProCal Stone Design." *Id*. at pp. 155-56. However, the Magistrate Judge stated there is no evidence any of the limestone mix at issue was manufactured or produced by Profanchik or Kinser with StoneCoat's limestone formula, "much less any evidence that it was manufactured in such a way as to research and accelerate the development of a competing product." *Id*. at p. 156. The Magistrate Judge concluded as follows:

> The Court, having considered the evidence of record and drawing all reasonable inferences in favor of Plaintiffs, finds there is not sufficient evidence to create a genuine issue of material fact that Profanchik and Kinser used the limestone formula prior to September 10, 2015. There is also no evidence the yet-to-be-formed ProCal entities ever used the limestone formula contained in the patent application prior to September 10, 2015. As such, the only alleged trade secret that could have been used by Profachik (and by extension ProCal) and/or Kinser would be the French formula.

*Id*.

Turning to the French formula, the Magistrate Judge stated the evidence before the Court, which was primarily created in the Collin County Litigation, reveals ProCal Stone Design does not manufacture its own limestone mix. Rather, it purchases its limestone mix ready-made from a company in Spain, which sold the same product to many others in the industry. *Id*. at p. 157. According to the Magistrate Judge, "Plaintiffs do not contend that ProCal Stone Design, despite the fact it claims to have bought the French formula from Mergaux in 2016, manufactures its own limestone mix using the French formula." *Id*.

After setting forth the applicable law on the definition of "use," *id*. at pp. 157-59, the Magistrate Judge concluded there was no evidence in the record showing Profanchik, Kinser, and/or ProCal Stone Design used or currently use the French formula. *Id.* at p. 159. The Magistrate Judge further explained as follows:

> As far as the Court can tell, Plaintiffs have not relied on any new evidence generated from the discovery conducted in this case, much less any evidence, circumstantial or otherwise, that could create a genuine issue of material fact as to Defendants' 'use' of the French formula. With the record before the Court, the Court cannot find a reasonable juror could find that Profanchik, Kinser, and/or ProCal Stone Design used (at a time uncertain) the French formula Mergaux states they purchased. The uncontroverted evidence before the Court is ProCal Stone Design does not manufacture its limestone mix.

*Id.* On the record before the Magistrate Judge, she held it would not be reasonable for a jury to infer that Profanchik, Kinser, and/or the ProCal entities used the French formula, the only remaining trade secret at issue. *Id*. at 160. In conclusion, the Magistrate Judge recommended Profanchik's, Kinser's, and the ProCal entities' motions for summary judgment regarding the trade secret misappropriation and related claims (Counts 2-3, 5) be granted. *Id.*

**Consideration of Plaintiffs' breach of contract and tortious inference claims (Counts 6, 8)**

As set out by the Magistrate Judge in Section VII of the R&R, Plaintiffs assert a breach of contract claim (Count 6) against all Defendants and a tortious interference with existing business relationships claim (Count 8) against the ProCal entities and Profanchik. *Id*. at pp. 160, 179. In their breach of contract claims, Plaintiffs have generally alleged "the contracts and agreements described [in the complaint] and entered into by the defendants are valid and enforceable contracts" and "defendants did not perform their obligations." *Id*. at pp. 160-61 (quoting Dkt. #103, ¶¶ 203, 206).

The Magistrate Judge first considered the ProCal entities' motions for summary judgment

as to the breach of contract claims, noting it is undisputed that no contract exists between Plaintiffs and ProCal and Plaintiffs' arguments regarding their breach of contract claims focus on the non-disclosure/non-compete agreements signed by Profanchik, Kinser, Villarreal, and Gonzalez. *Id*. at pp. 161-62. The Magistrate Judge recommended the ProCal entities' motions for summary judgment as to Plaintiffs' breach of contract claims (Count 6) be granted, leaving only Plaintiffs' breach of contract claims against Kinser, Villarreal, and Gonzalez related to their non-disclosure/non-competition ("NDA") agreements. *Id*. at p. 162.

These defendants argue Plaintiffs have failed to plead any specific breaches of contract with regard to them. To the extent the Court finds otherwise, these defendants move to dismiss the breach of contract claim against them because of lack of consideration and because the NDAs are unenforceable as a matter of law because they do not contain reasonable restrictions. Specifically, these defendants assert the NDAs are illusory and not supported by consideration; contain an unreasonable industry-wide scope and undefined geographic restriction; and contain an unreasonable five-year term. *Id.* at p. 162.

The Magistrate Judge first concluded the agreements satisfy the requirements of the first element, which requires that the non-compete agreement be ancillary to or part of an otherwise enforceable agreement at the time the agreement is made. *Id*. at p. 171 (further finding there is sufficient evidence Kinser, Villarreal, and Gonzalez received confidential information after they signed the agreements, and said information can support the non-compete agreements entered into by these defendants). The Magistrate Judge then considered the reasonableness of the restrictions contained in the agreements and found the scope of the non-complete agreements is impermissibly broad, especially considering the five-year time restriction and the fact there is no geographical

limitation or acceptable substitute in the non-compete provisions. *Id*. at p. 174. Noting the non-compete agreements are unenforceable as a matter of law, the Magistrate Judge then considered whether the Court should reform the agreements. *Id*. at pp. 175-77. She concluded reformation is unwarranted. *Id*. at pp. 176-77.

The Magistrate Judge next addressed Plaintiffs' claim that Kinser, Villarreal, and Gonzalez breached the non-disclosure provisions of the NDAs by disclosing Plaintiffs' confidential information. According to the Magistrate Judge, the uncontroverted evidence shows Kinser was never paid by SCOT. *Id*. at p. 178. Regarding Villarreal and Gonzalez, although the evidence shows they had access to information before and after the execution of the non-disclosure agreements that could be characterized as confidential information, the Magistrate Judge concluded "Plaintiffs have not produced evidence sufficient to create a genuine issue of material fact that Villarreal or Gonzalez used any confidential information thereby breaching the nondisclosure covenants." *Id*. The Magistrate Judge recommended Kinser's, Villarreal's, and Gonzalez's motions for summary judgment as to Plaintiffs' breach of contract claims (Count 6) be granted.

She also recommended summary judgment be granted against Plaintiffs' tortious interference with existing business relationship claims (Count 8) against the ProCal entities and Profanchik. In so finding, the Magistrate Judge noted she had previously found the Kinser, Villarreal, and Gonzalez covenants not to compete unenforceable and declined to reform them and also that there is no evidence Kinser was subject to the non-disclosure agreement and Plaintiffs have not produced sufficient evidence showing that Villarreal or Gonzalez used any confidential information thereby breaching their non-disclosure covenants. *Id*. at p. 181. According to the Magistrate Judge, the only remaining contract at issue in this case is the 2011 Product Rights Agreement, and Plaintiffs have

failed to produce sufficient evidence showing Profanchik or the ProCal entities knowingly induced Mergaux or Chamielec to breach their contract obligations. *Id*. at pp. 181-84.

**Consideration of Plaintiffs' breach of fiduciary duty claims (Count 7)**

Noting the only remaining breach of fiduciary duty claims in this case are against Kinser, Villarreal, and Gonzalez, the Magistrate Judge first found insufficient evidence that would support finding a fiduciary relationship between Plaintiffs and Kinser. *Id*. at p. 188. Thus, she recommended Kinser's motion for summary judgment on Plaintiffs' breach of fiduciary duty claim be granted. The Magistrate Judge next considered Plaintiffs' breach of fiduciary duty claims against Villarreal and Gonzalez, noting they did not owe any fiduciary duties to Plaintiffs after they resigned their employment. *Id*. at p. 189. The Magistrate Judge stated there is no evidence that either Villarreal or Gonzalez misappropriated Plaintiffs' trade secrets, solicited Plaintiffs' customers, or carried away any confidential information; as such, the Magistrate Judge recommended Villarreal's and Gonzalez's motion for summary judgment as to Plaintiffs' claims for breach of fiduciary duty be granted. *Id.*

**Consideration of Plaintiffs' unfair competition and conspiracy claims (Count 9)**

The Magistrate Judge also found summary judgment appropriate on Plaintiffs' unfair competition and civil conspiracy claims. *Id*. at p. 190. According to the Magistrate Judge, Plaintiffs' unfair competition and conspiracy claims depend on Plaintiffs' establishing one or more of the claims previously discussed. *Id*. Because they have failed to do so, Plaintiffs' derivative claims also fail, according to the Magistrate Judge.


**Consideration of Plaintiffs' claims for declaratory and injunctive relief**

Finally, to the extent not mooted by the Magistrate Judge's recommended grant of summary judgment on Plaintiffs' claims, the Magistrate Judge recommended summary judgment be granted for Defendants on Plaintiffs' request for declaratory judgment. *Id.* at p. 191. She also recommended Defendants' motions for summary judgment regarding Plaintiffs' claims for injunctive relief be granted, noting Plaintiffs cannot establish a likelihood of success on the merits when all of their causes of action should be dismissed. *Id.*

## OBJECTIONS

As permitted by the Magistrate Judge, Plaintiffs incorporated additional evidence into their objections.[6] *See* Dkt. #261 at p. 13, n. 6 (denying Plaintiffs' motion for leave to supplement their responses to Defendants' motions for summary judgment but advising Plaintiffs they may incorporate the information into their objections to the August 12, 2019 R&R). In addition to the entire record considered by the Magistrate Judge, Plaintiffs request the Court consider the new evidence attached to the objections. The Court will consider the new evidence in its *de novo* review.

Plaintiffs first object to some of the Magistrate Judge's recommendations regarding their

---

[6] Plaintiffs attach the following additional evidence to their objections to Dkt. #s265 and 267: (1) translated September 15, 2016 Contract of Assignment for Know-How and Intellectual Property between Chamielec and Profanchik ("September 15, 2016 Contract"); (2) July 23, 2019 email from Defendants' counsel to Plaintiffs' counsel regarding the redacted pages in the September 15, 2016 Contract containing the secret formula which was subject to the Product Rights Agreement; (3) August 6, 2019 letter from Defendants' counsel disclosing DEF 4811-4880 in accordance with the Subpoenas Duces Tecum served to Profanchik and the ProCal entities; (4) March 9, 2016 letter of intent between Chamielec and Profanchik (filed under seal); (5) June 21, 2016 sworn statement by Chaielec regarding sale (filed under seal); (6) ProCal customer marketing brochure and PowerPoint (filed under seal); (7) ProCal marketing brochure; (8) April 14, 2017 PUMA invoice; (9) Excerpts of August 6, 2019 deposition of Profanchik; (10) August 11, 2019 letter requesting additional documents from Defendants; (11) August 14, 2019 email from Defendants' counsel producing additional documents; (12) June 30, 2016 Mergaux sworn statement of sale; (13) June 1, 2016 Tri-Party agreement between Profanchik, Chamielec, and Mergaux; (14) Excerpts of August 7, 2019 deposition of Profanchik (filed under seal); (15) Additional excerpts of August 7, 2019 deposition of Profanchik (filed under seal); (16) August 15, 2019 email from Defendants' counsel regarding Defendants' document production; (17) August 17, 2019 email to Defendants' counsel requesting production of documents; (18) August 21, 2019 email to Defendants' counsel requesting production of documents; (19) June 28, 2016 of Profanchik and Mergaux from Hopkins State Litigation trial; and (20) Affidavit of Wm. Charles Bundren, Esq. in Support of Plaintiffs' objections.

conversion and trade secret misappropriation claims. Specifically regarding the conversion claims, Plaintiffs assert the Magistrate Judge erred in recommending dismissal of their claim that Profanchik and ProCal Stone Design converted the physical envelope containing physical documents describing the French formula. Dkt. #265 at p. 12. According to Plaintiffs, once intangible property has been merged into a paper document, the physical document (property) is subject to a conversion claim. *Id*. at p. 12.

Regarding their trade secret misappropriation claims, Plaintiffs first assert the Magistrate Judge did not address Plaintiffs' Defend Trade Secrets Act ("DTSA") claims. *Id*. at p. 13. According to Plaintiffs' objections, neither DTSA nor the Texas Uniform Trade secrets Act ("TUTSA") requires "use" of the trade secret in order to prove misappropriation. Rather, all that is required is acquisition of a trade secret by improper means. Additionally, Plaintiffs contend Profanchik's and ProCal's "use" of the French formula without StoneCoat GP's consent constitutes misappropriation. Plaintiffs further assert Profanchik and ProCal have promoted and marketed ("bragged" about) the French formula through their solicitation of customers and references to their "French beginnings," partnership and association with Chamielec who invented and developed the French formula which is claimed to be the "original formula" now claim to be owned exclusively by Profanchik and ProCal. According to Plaintiffs, Profanchik and ProCal have touted their partnership and close working relationship with Chamielec and Chamielec's "perfection" and "innovation" of the French formula in France. Thus, according to Plaintiffs, Profanchik and ProCal have used the French formula to promote their business, market their business, and solicit customers in interstate commerce. Dkt. #265, Exs. 6, 7 and 9.

Plaintiffs further object to some of the Magistrate Judge's recommendations regarding

Plaintiffs' breach of contract claims against Kinser, Villarreal, and Gonzalez. According to Plaintiffs, the restrictions in the non-compete agreements are reasonable and clearly for the purpose of protecting the goodwill, trade secrets, and confidential information of StoneCoat. Dkt. #265 at p. 24.

Plaintiffs also object to the Magistrate Judge's recommendation that their claims against Profanchik and ProCal regarding their alleged interference with StoneCoat GP's Product Rights Agreement be dismissed. Relying on the new evidence submitted in their objections, Plaintiffs argue there is sufficient evidence in the record to create a genuine issue of material fact that Profanchik knowingly induced Mergaux and Chamielec to breach their contract obligations.

Finally, Plaintiffs object to the Magistrate Judge's recommendations regarding Plaintiffs' unfair competition and conspiracy claims, as well as their request for injunctive relief. According to Plaintiffs, because there are valid substantive claims, the derivative claims are valid as well. *Id.* at p. 29. Plaintiffs further maintain they are entitled to injunctive relief to the extent permitted by law, including injunctive relief regarding their trade secret misappropriation claims and contract interference claims. *Id.*

## *DE NOVO* REVIEW[7]

**Dismissal of claims with no specific objections as to those findings**

Federal Rule of Civil Procedure 72 provides "a party may serve and file *specific* written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b)(2) (emphasis added). "Parties filing objections must specifically identify those findings [to which they object].

---

[7] The Court will apply the well settled summary judgment standards set forth by the Magistrate Judge in the August 12 R&R.

Frivolous, conclusive or general objections need not be considered by the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982) (en banc), *overruled on other grounds by Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc); *Chase Bank USA, N.A. v. McLain*, No. 1:12-CV-353, 2013 WL 713404, at *1 (E.D. Tex. Feb. 26, 2012). The August 12 R&R specifically provided that in order to be specific, "an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found." Dkt. #241 at p. 192.

In their objections, Plaintiffs specifically address the following: (1) Plaintiffs' conversion claims against Profanchik and ProCal Stone Design for converting the physical envelope and physical papers within the envelope describing the French formula; (2) Plaintiffs' trade secret misappropriation, DTSA, and TUTSA claims regarding the French formula and Profanchik/ProCal's use of it; (3) Plaintiffs' claims against Kinser, Villarreal, and Gonzalez for breach of their non-compete agreements; (4) Plaintiffs' claims against Profanchik and ProCal regarding their alleged interference with StoneCoat GP's Product Rights Agreement; (5) Plaintiffs' unfair competition and conspiracy claims; and (6) Plaintiff's request for injunctive relief. However, Plaintiffs do not specifically object to the numerous other findings and conclusions of the Magistrate Judge.

Plaintiffs do not mention the Magistrate Judge's recommendations regarding their Lanham Act claims, breach of fiduciary duty claims, or their claims for declaratory relief. With the exception of their conversion claims against Profanchik and ProCal Stone Design regarding the physical envelope containing papers describing the French formula, Plaintiffs do not reference, much less object to, the Magistrate Judge's other findings regarding their conversion claims. Plaintiffs do not

object to the Magistrate Judge's findings regarding any alleged trade secret other than the French formula. Nor do Plaintiffs object to the Magistrate Judge's findings and ultimate conclusion that there is insufficient evidence in the record to create a genuine issue of material fact that Villarreal and Gonzalez acquired or discovered (through improper means or otherwise) the French formula.

The Court agrees with those findings and conclusions of the Magistrate Judge and adopts them as the findings and conclusions of the Court with no further discussion. Specifically, the Court agrees Plaintiffs' Lanham Act claims (Count 1), breach of fiduciary duty claims (Count 7), and claims for declaratory relief against all defendants should be dismissed. The Court also grants summary judgment against Plaintiffs' conversion claims (Count 4) against Kinser, Villarreal, and Gonzalez. The Court also grants summary judgment against Plaintiffs' trade secret misappropriation (and unfair competition and conspiracy claims) (Counts 2-3, 5, 9) against Villarreal and Gonzalez. The Court also grants summary judgment against Plaintiffs' breach of contract claims (Count 6) against Profanchik and the ProCal entities and against Kinser, Villarreal, and Gonzalez for violation of the non-disclosure agreements. Finally, the Court grants summary judgment against Plaintiffs' tortious interference claims (Count 8) against Profanchik and ProCal regarding their alleged interference with any contract other than the 2011 Product Rights Agreement.

Before considering Plaintiffs' objections to the findings and conclusions of the Magistrate Judge as to certain remaining conversion, trade secret misappropriation, breach of contract, and tortious interference claims, as well as Plaintiffs' unfair competition and conspiracy claims and request for injunctive relief, the Court sets forth the additional evidence relied upon by Plaintiffs that was not before the Magistrate Judge.

**New evidence**

**Defendants' July 1, 2019 document production**

On July 1, 2019, Defendants produced the Declaration of Lawrence A. Stelly (a French interpreter) interpreting a French language contract dated September 15, 2016 and entitled: "CONTRACT OF ASSIGNMENT FOR KNOW-HOW AND INTELLECTUAL PROPERTY."[8] ("September 15, 2016 Contract"). This contract was between Chamielec and Profanchik and was for the assignment to Profanchik of a "specific formula" owned by Chamielec and "corresponding confidential information and know-how" to enable the fabrication of an application of "lime-based coatings for interior and exterior walls on commercial buildings and residential houses." Dkt. #265-1 at DEF 4630. In the September 15, 2016 Contract, Chamielec sold, and Profanchik purchased, all of the "formulas" and intellectual property related to manufacturing and applying sprayed limestone to "interior and exterior walls" for a price of "125,000 Euros." *Id.* at DEF 4631. The assignment was for all of the intellectual property of Chamielec "worldwide." *Id.* The contract also provided that Chamielec was unaware of any "third parties" that would know of the formula or the intellectual property he was selling to Profanchik "with the exception of Mr. Ken Morrison and of the company Stonecoat in Addison Texas." *Id.* at DEF 4632, 6(h).

Certain information on the interpretation of the September 15, 2016 Contract was "redacted"

---

[8] It is important to note the French contract entitled "Contract de Cession de Savoir-Faire et Propriété Intellectuelle," which was recently translated by Mr. Stelly, was first produced to Morrison and SCOT in the Collin County Litigation on or about August 10, 2017. *See* Defendants' Response to Plaintiffs' Emergency Motion to Amend Scheduling Order, Continue Trial, Extend Other Deadlines and for Sanctions (Dkt. #254) at p. 3. According to Defendants, it was produced in this case as part of Defendants' initial disclosures on August 28, 2017. *Id.* Even if there were some dispute about the date the French contract was produced, Defendants assert the record is clear that Plaintiffs had a copy when they filed the contract (in French) on August 31, 2018 in their response to Profanchik's Motion for Summary Judgment (Dkt. #79-12). The record reveals Plaintiffs have known for at least one year, and more likely for two years or longer, that Profanchik purchased the French formula from Chamielec.

by Defendants; thus, on July 20, 2019, Plaintiffs' counsel requested that the redacted information be provided "under AEO." On July 23, 2019, Defendants' counsel emailed Plaintiffs' counsel declining to provide those pages in un-redacted form, stating the "specific pages contain the secret formula ingredients and percentages for each ingredient." Dkt. #265-2. She further stated "the secret formula is and remains secret." *Id.* Plaintiffs' counsel stated she would be amenable to discussing a possible stipulation as to the formula and indicated she could "probably agree to something along the lines of 'the formula, which was subject to the [P]roduct Rights Agreement, was sold to Mr. Profanchik after it was released from escrow.'" *Id.*

On July 1, 2019, ProCal Stone Design also disclosed a marketing statement that describes its relationship with "Pierre Laurant Chamielec" and his perfection of a "formula" and Mergaux's learning "Pierre's innovation," and includes a picture of "Pierre" (Chamielec) and "Philippe" (Mergaux) with "over 40 years of experience." Dkt. #265-7 at DEF 4308-4302. Chamielec and Mergaux are the same individuals who signed the Product Rights Agreement with StoneCoat GP on December 21, 2011, agreeing to sell the French formula to StoneCoat GP exclusively (*see* Dkt. #67-19 at p. 6, ¶8) and also promising not to disclose information and not to compete with StoneCoat GP. *Id*. at pp. 7-8, ¶¶11 and 12.

### *Defendants' August 6, 2019 document production*

On the first day of the Profanchik deposition, Defendants produced new documents labeled DEF 4811-4880. Dkt. #265-3. These new documents include an August 6, 2019 "Letter of Intent" ("LOI") dated March 9, 2016 and signed by Chamielec and Profanchik, individually and as majority owner of ProCal Stone Design, whereby Chamielec would "sell all assets including all intellectual property to" ProCal. Dkt. #267-1 at DEF 4862-4870. The LOI concerned "a method and technique

used in the business of the spray-on application of the limestone surface on interior and exterior walls of commercial buildings and residential homes in France and Europe, pursuant to which each Party may provide to the other certain confidential and proprietary information." *Id.* at DEF 4866.

On August 6, 2019, Defendants also produced an email dated June 21, 2016 from Chamielec, to Profanchik, including a sworn statement by Chamielec that he sold to Profanchik and his company for $120,000.00 the original French formula described in the December 21, 2011 Product Rights Agreement. Dkt. #267-2 (filed under seal).

In addition, on August 6, 2019, Profanchik produced a marketing and advertising brochure of ProCal Stone Designwhich mentions the "French Beginnings" of ProCal. Dkt. #267-3 (filed under seal) at DEF 4827. The brochure also describes ProCal Stone Design's partnership with "Pierre Laurent, a builder in France," who, in collaboration with a major limestone repair company, developed a "formula." *Id.* at DEF 4830 (further stating the "product is now a ready mixed bag that when added to water begins to hydrate. . . and carbonize," with the final result being "a decorative wall coating that is one solid piece of carved limestone"). The brochure further states ProCal Stone Design's "formula is the result of 18 years of field application," and all ProCal Stone Design's "formulas are kept in a safe." *Id*. at DEF 4838. Profanchik testified at his August 6, 2019 deposition that ProCal used these marketing materials and powerpoints when giving presentations to a prospective customer or to train an employee. Profanchik Dep. (Dkt. #265-9) at 15:4-15 & 16:12-24.

### *Profanchik's August 6-7, 2019 deposition*

On the second day of his deposition, Profanchik stated Kinser and Gonzalez tried to come up with a formula for horizontal limestone between May 2015 and September 2015, but it did not work so Profanchik went into the vertical sprayed-limestone business in the fall of 2015. Profanchik

Dep. (Dkt. #265-14) at 230:15-231:1. When Profanchik opened a showroom in September 2015, he used some product that had been sold to him by Mergaux. *Id*. at 229:12-19. Profanchik did not enter into a contract with Mergaux to purchase those products, and he testified he only received that one shipment from Mergaux to do the showroom. *Id.* at 232:1-9 & Dkt. #267-5 at 307:3-6 (filed under seal).

Sometime in the late fall of 2015, Profanchik traveled to France to meet with Chamielec, the original inventor of sprayed limestone who had been working in the industry for about eighteen years and who had created, to Profanchik's knowledge, at least three formulas in the sprayed limestone business. Profanchik Dep. (Dkt. #265-14) at 232:24-233:17 & 234:17-235:13; *see also* Profanchik Dep. (Dkt. # 267-5) at 303:11 (filed under seal). At some point, Chamielec began to work with a company in Spain called Puma. Profanchik Dep. (Dkt. #265-14) at 235:16-19. At his deposition, Profanchik was specifically asked about the reference in ProCal's marketing and advertising brochure to Chamielec's collaboration with a major limestone repair company and laboratory and field testing that he had done to develop a "formula that would retard the natural curing process or cycle limestone from crushed state back to hardness." *Id*. at 213:5-18 (regarding Dkt. #267-3 (filed under seal) at DEF 4830). Profanchik testified that is a "different formula than what was contained in the envelope," and Puma, a company located in Cordoba, Spain, is the "major limestone-repair company" that Chamielec developed that formula with. *Id*. at 213:20-214:25. According to Profanchik, Chamielec was involved with the formulation that Profanchik calls the "Puma formula." *Id*. at 215:13-19. Profanchik testified the formula ProCal Stone Design currently uses "has never belonged to anyone except Puma." *Id*. at 226:12-227:3.

Profanchik returned to Europe in 2016. *Id*. at 215:20-23 & 228:16-20. In one of his meetings

with Chamielec in France, Profanchik entered into the September 15, 2016 Contract, wherein Chamielec gave Profanchik all of his intellectual property. *Id*. at 228:16-229:11. On Profanchik's second or third trip to Europe to meet with Chamielec, Chamielec introduced Profanchik to Puma. Profanchik Dep. (Dkt. # 267-5) at 303:3-13 (filed under seal).

Profanchik executed a contract with Puma "in English" while in Spain with Chamielec and Puma.[9] *Id*. at 303:9-18 (filed under seal). Profanchik could not say for sure that he did not start receiving materials from Puma prior to the execution of that contract. *Id*. at 304:19-305:2 (filed under seal) (stating he may have received one or two shipments before the contract was negotiated). Puma delivers bags of limestone to ProCal with the formulation already included so all that is necessary is the addition of water. *Id.* at 305:4-12 (filed under seal). According to Profanchik, although Chamielec had been working with Puma for some time on some formulas, the materials ProCal currently receives from Puma do not include any of the "know-how or knowledge from Mr. Chamielec." *Id*. at 306:6-12 (filed under seal). Profanchik has not had any other suppliers from Europe, and he has not had any other suppliers other than Mergaux and Puma. *Id*. at 306:20-22 & 307:14-20 (filed under seal).

According to Profanchik, when he started applying product for customers of ProCal Stone Design in January 2016 he got the product from Puma, the company Chamielec had introduced him to. Profanchik Dep. (Dkt. #265-14) at 232:18-23. It was Puma's formula that Chamielec assisted in developing, "not the one in the envelope." *Id*. at 235:20-236:5. Profanchik represented he has

---

[9] Plaintiffs state they have requested Defendants disclose information regarding Profanchik and ProCal's complete relationship with Puma regarding the formula being used to provide the bags of limestone materials to ProCal, but Defendants have refused to disclose this information. *See* August 21, 2019 email to Blayre Pena, Esq. (Dkt. #265-18).

seen the envelope but never the formula in the envelope. *Id.* at 236:6-9. Profanchik testified he got possession of an envelope from Mergaux that contained a formula in the fall of 2016 after Profanchik finalized his September 15, 2016 Contract with Chamielec. *Id.* at 212:19-22 & 222:3-21. According to Profanchik, this is the same formula that Profanchik obtained rights to with his September 15, 2016 Contract with Chamielec. *Id.* at 213:1-4.

Profanchik stated ProCal Stone Design has multiple formulas that are currently in the possession of Defendants' attorneys, a couple of which were ones Kinser tried to create but which "were not good." *Id.* at 221:4-25. Profanchik also mentioned a payment to Mergaux sometime in early 2016 for his rights to a formula. Profanchik was not sure if it was the same formula that was in the Product Rights Agreement, but he agreed the envelope he got from Mergaux is one of the formulas Profanchik keeps in the safe with the law firm. *Id.* at 224:7-22; *see also id.* at 222:3-10 (stating the envelope that contained the French formula referenced in the Product Rights Agreement is also with the law firm).

### Defendants' August 14, 2019 document production

On August 14, 2019, Defendants disclosed new information and produced additional new documents and evidence. *See* Dkt. #264-11 at DEF 4881-4921. In a June 30, 2016 letter from Mergaux to Profanchik,[10] Mergaux certifies he "sold the original Formula used in the product rights, formula purchase and royalty agreement signed on December 21st 2011 to John D. Profanchik of Plano, Texas and Procal" and also that the "formula was sold and transferred to John Profanchik for the sum of $5000." Dkt. #265-12 at DEF 4922. The letter also states "Mr. Profanchik received the

---

[10] It is significant to Plaintiffs that the date of this letter was just two days after the jury in the Hopkins State Litigation found Mergaux breached the Product Rights Agreement. *See i.e.* Dkt. #67-18.

same 'original' unopened sealed envelope that was used on Dec 21st when the formula was sold to Stonecoat LP, Stonecoat GP, Mr. Fred Hopkins and Mr. Ken Morrison." *Id.* According to the letter, the Product Rights Agreement was terminated on December 12, 2012 for breach of contract and nonpayment of royalties. *Id.*

Defendants also produced a June 1, 2016 tri-party "Third Party Payment Agreement" between Puma, Profanchik, and Chamielec. Dkt. #265-13 at DEF 4924 (filed under seal). According to Plaintiffs, the June 1, 2016 agreement between Chamielec, Puma, and ProCal establishes a relationship between Chamielec (the alleged inventor of the French formula) and Puma, Profanchik, and ProCal. Dkt. #265 at p. 6.

### *Additional attachment to Plaintiffs' objections*

On September 5, 2019, Plaintiffs filed an additional attachment to Plaintiffs' objections to the August 12 R&R. Dkt. #281. According to Plaintiffs, four days after they filed their objections, Profanchik and ProCal Stone Design filed a claim in the bankruptcy case of Philippe Mergaux ("Mergaux") (Case No. 18-40659-elm7 pending in the United States Bankruptcy Court for the Northern District of Texas) regarding Profanchik and ProCal Stone Design's "purchase" of the "French formula" on June 30, 2016 "which was previously subject to a Product Rights Agreement." *Id.* at p. 2. A copy of Profanchik's and ProCal Stone Design's August 30, 2019 Proof of Claim is attached as Exhibit 1 to Dkt.#281. In that filing, Profanchik and ProCal Stone Design filed a "contingent claim in the amount of $470,491.90 in the event i) the Motion to Approve Settlement of Pending State Court Appeal is granted . . ., ii) the Fifth Court of Appeals enters an order directing the 116th Judicial District Court to enter a judgment adverse to Claimants' interest, and iii) the 116th District Court actually enters said final judgment adverse to Claimants' interest." Dkt. #281-1,

Exhibit 1 (emphasis in original).

According to Profanchik and ProCal Stone Design, the basis for the contingent claim is the purchase of a French formula from Mergaux on or about June 30, 2016. Profanchik and ProCal reference (and attach to) their Proof of Claim the June 30, 2016 sworn statement of Mergaux that he "sold the original formula used in the product rights, formula purchase and royalty agreement signed on December 21st to John D. Profanchik of Plano Tx and Procal Stone Design, LLC." *Id.* In reliance on this transaction, Profanchik and ProCal Stone Design paid approximately $5000.00 to Mergaux for the purchase of the French formula; paid approximately $54,900.00 for the benefit of Mergaux to secure legal representation; and paid approximately $410,591.90 to "promote the product and rights purchased." *Id.*

**De novo review of claims with specific objections as to those findings**

### Applicable law

Because it will aid the Court's discussion below, the Court sets forth the general trade secret law provided by the Magistrate Judge in the August 12 R&R, as well as some specific law regarding DTSA and TUTSA. Dkt. #241 at pp. 112-114. Trade secret misappropriation began as a "solely common-law claim," but with the enactment of the Texas Theft Liability Act ("TTLA") in 1989, "the Texas Legislature provided an additional civil remedy to victims of trade-secret theft as defined in the Texas Penal Code." *BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, No. 4:15-CV-00627, 2017 WL 2730739, at *10 (S.D. Tex. June 26, 2017) (citing *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 668 (S.D. Tex. 2015)). As a result, parties could assert both claims against the same defendant if the facts supported it. *See, e.g.*, *Spear Marketing, Inc. v. BancorpSouth Bank*, 791 F.3d 586, 591 (5th Cir. 2015); *Intermoor Inc. v. Wilson*, 4:14-CV-01392, 2016 WL 1107083, at *2 (S.D. Tex. Mar. 22,

2016); *Beardmore*, 131 F. Supp. 3d at 666; *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 449 n.3 (5th Cir. 2007). In such cases, the common law governed the trade-secret-misappropriation claim, while the TTLA governed the theft-of-trade-secret claim. *BHL*, 2017 WL 2730739, at *10 (citing *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 3:15-CV-4108-D, 2017 WL 635031, at *14 (N.D. Tex. Feb. 16, 2017); *Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.*, SA-14-CA-918-OLG, 2015 WL 12866214, at *13 (W.D. Tex. Apr. 10, 2015), *report and recommendation adopted sub nom. Raybourne & Dean Consulting v. Metrica, Inc.*, SA-14-CV-00918-OLG, 2015 WL 12867469 (W.D. Tex. May 7, 2015)).

In 2013, in an effort to bring Texas law in line with the "overwhelming majority of the United States" and "provid[e] a simple legislative framework for litigating trade secret issues in Texas," the Texas Legislature enacted a modified version of the Uniform Trade Secrets Act. *BHL*, 2017 WL 2730739, at *11 (quoting Texas Bill Analysis, S.B. 953, 2013 at 1). The enrolled bill, known as the TUTSA, became effective on September 1, 2013, and displaces both common-law misappropriation-of-trade-secret and TTLA theft-of-trade-secret claims. *BHL*, 2017 WL 2730739, at *11 (citing *In re Mandel*, 578 Fed. Appx. 376, 384 n.8 (5th Cir. 2014) (per curiam) (unpublished); *Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 915 (W.D. Tex. 2015)).

TUTSA and DTSA are both based on the Uniform Trade Secrets Act ("UTSA") promulgated by the National Conference of Commissioners on Uniform Laws in 1985 and adopted by 47 states. Joseph F. Cleveland, Jr. & Herbert J. Hammond, *TUTSA vs. DTSA – Should I Bring My Trade-Secret Case in State or Federal Court?*, 2017 TXCLE-AIP 18 II, 2017 WL 8316069 (2017). Therefore, a substantial number of provisions, including the definition of "trade secret," are identical

or very similar in many respects.[11] *Id.* There are a handful of differences, one of which is TUTSA preempts common law tort claims whereas DTSA does not. *Id.*

The TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *DHI Grp., Inc. v. Kent*, No. CV H-16-1670, 2019 WL 3754859, at *10 (S.D. Tex. July 12, 2019) (quoting TEX. CIV. PRAC. & REM. CODE § 134A.007(a)). "Where a claim is based on a misappropriation of a trade secret, then it is preempted by the [TUTSA]." *Id.* (quoting *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App.—Corpus Christi 2017, no pet.) (citing TEX. CIV. PRAC. & REM. CODE § 134A.007(a))). The TUTSA has no effect on "other civil remedies that are not based upon misappropriation of a trade secret. . . ." TEX. CIV. PRAC. & REM. CODE § 134A.007(b)(2).

The scope of the TUTSA is a question of Texas law. Because the TUTSA was so recently enacted, few Texas courts have interpreted the scope of its preemption provision. "The only one to have done so in detail," in *Super Starr International, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829 (Tex. App. – Corpus Christi-Edinburg 2017), acknowledged the TUTSA "'was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 1796293, at *12 (E.D. Va. Apr. 16, 2018) (quoting *Super Starr*, 531 S.W.3d at 843 (quoting *Smithfield Ham & Prod. Co. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995))). As a result, the court in *Super Starr* found that

---

[11] Both TUTSA and the DTSA permit recovery of damages for trade secret misappropriation. TEX. CIV. PRAC. & REM. CODE § 134A.004; 18 U.S.C. § 1836(b)(1) (permitting recovery for trade secret misappropriation if a trade secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce").

a distributor's TUTSA claim preempted its separate breach of fiduciary duty claim because the latter was alleged in such a way that the breaches of fiduciary duty could not have occurred "without the use of alleged trade secrets." *Steves & Sons,* 2018 WL 1796293, at \*12 (quoting *Super Starr*, 531 S.W.3d at 843).

Texas federal courts have come to differing conclusions on whether the TUTSA's preemption provision encompasses the misappropriation of information that is not a trade secret. *DHI Grp., Inc.*, 2019 WL 3754859, at \*10 (citing *AMID, Inc. v. Medic Alert Found. United States, Inc.*, 241 F. Supp. 3d 788, 827 (S.D. Tex. 2017) (holding that the plaintiff was allowed to plead that the defendant "misappropriated information protected as trade secrets, and alternatively under the theory that the misappropriated information was not a trade secret but was confidential"); also citing *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, 1:17-CV-444-RP, 2018 WL 315753, at \*3 (W.D. Tex. Jan. 5, 2018) (following the "majority approach" and holding that the "TUTSA's preemption provision encompasses all claims based on the alleged improper taking of confidential business information")). "After reviewing the reasoning in *Super Starr* and that of various other courts across the country applying Uniform Trade Secrets Act preemption, the [*Embarcadero* court found] that [the] TUTSA's preemption provision encompasses all claims based on the alleged improper taking of confidential business information." *DHI Grp., Inc.*, 2019 WL 3754859, at \*10 (quoting *Embarcadero*, 2018 WL 315753, at \*3). However, the court in *DHI Group* failed "to see how the plain language of the TUTSA's preemption provision can be read to preempt civil remedies for the misappropriation of information that is not a trade secret." *DHI Grp., Inc.*, 2019 WL 3754859, at \*11. "Accordingly, without further guidance from Texas courts, the court [found] the reasoning in *AMID* persuasive and [concluded the plaintiffs] may maintain their causes of action for

the misappropriation of trade secrets under the TUTSA as well as their causes of action for the misappropriation of information that is not a trade secret. *Id.*

### *TUTSA preemption of conversion, unfair competition, and tortious interference claims*

In Count 2, Plaintiffs allege common law misappropriation of trade secrets. In Count 3, they allege trade secret misappropriation pursuant to the DTSA. In their conversion claim (Count 4), Plaintiffs allege "Defendants have exercised unauthorized dominion and control over Plaintiffs' property, including the confidential and proprietary information and trade secrets of Plaintiffs, and have thereby converted Plaintiffs' property to Defendants on use." Dkt. #103, ¶ 183. Plaintiffs' claims in Count 5 were brought pursuant to the "Texas Theft Liability Act." *Id.*, ¶¶ 190-201.

According to the Magistrate Judge, the TUTSA displaced inconsistent common law claims concerning conduct taking place after September 1, 2013; thus, notwithstanding Plaintiffs' reference to the TTLA in their complaint, the Magistrate Judge construed Plaintiffs' allegations as a misappropriation of trade secrets claims under the TUTSA rather than a TTLA civil-theft claim. Dkt. #241 at p. 113. Plaintiffs do not object to this finding. Because the alleged misappropriation occurred after September 1, 2013, TUTSA, not common law trade secret misappropriation or TTLA, governs this dispute.

In the underlying briefing before the Magistrate Judge, the parties did not raise the issue of whether the TUTSA preempts any of Plaintiffs' other state law claims. Defendants addressed together Plaintiffs' "various iterations of misappropriation of trade secrets and unfair competition related to this alleged misappropriation," including Plaintiffs' conversion claim, all of which rely on

the existence of a trade secret as an essential element.[12] *See, e.g.* Dkt. #195 at p. 11. Defendants argued all such claims fail because either Plaintiffs cannot establish they have trade secrets or there is no evidence Defendants acquired or are using the alleged trade secrets. *Id.*

The Magistrate Judge found that conversion does not apply to Defendants' alleged acts in connection with StoneCoat, which the Magistrate Judge viewed as more properly considered in relation to Plaintiffs' trade secret misappropriation claims. *See* Dkt. #241 at 111-12 (quoting *Beardmore*, 131 F. Supp. 3d at 668). Plaintiffs object to this finding, asserting their claim for conversion of the physical envelope containing the physical papers describing the French formula is valid. Dkt. #265 at pp. 10-11. According to Plaintiffs, once intangible property has been merged into a paper document, the physical document is subject to a conversion claim. *Id.* at p. 12.

In the briefing before the Magistrate Judge, Plaintiffs generally alleged they have trade secrets, focusing at the hearing on the French formula itself. With no specific argument by Plaintiffs regarding the physical envelope containing the physical papers describing the French formula, the Magistrate Judge viewed Plaintiffs' claim as one for conversion of intangible data which cannot independently support a conversion claim in Texas. As is often the case, Plaintiffs argue more specifically in their objections than they did before the Magistrate Judge.

_____

[12] As set forth by the Magistrate Judge, under Texas law conversion is "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Beardmore*, 131 F. Supp. 3d at 666 (quoting *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir.2003) (quoting *Waisath v. Lack's Stores,* 474 S.W.2d 444, 447 (Tex.1971))). As noted by the Magistrate Judge, "Texas conversion law. . . concerns only physical property." *Lifesize, Inc. v. Chimene*, No. 1:16-CV-1109-RP, 2017 WL 1532609, at *10 (W.D. Tex. Apr. 26, 2017) (quoting *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003)). When an "allegation involves only intellectual property rights . . . rather than rights regarding physical property . . . [it] is outside the scope of Texas conversion law, which concerns only physical property." *Beardmore*, 131 F. Supp. 3d at 666. "Texas recognizes a limited exception to the tangibility requirement, allowing conversion of intangible rights embodied in or 'merged' with unique paper documents." *Id.* at 667 (citing *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982)). Where intangible rights have merged with a tangible document, "[t]he conversion of the document in which the rights had been merged supports a conversion action for the value of the rights represented by it." *Lifesize*, 2017 WL 1532609, at *10 (quoting *Prewitt*, 643 S.W.3d at 123).

They now focus their claim for conversion on Profanchik's possession of the physical envelope containing physical papers describing the French formula. In their objections, Plaintiffs state the Magistrate Judge, like Plaintiffs, did not have the benefit of the "newly discovered evidence by Defendants which clearly establishes that Profanchik converted the *physical envelope* described in the Product Rights Agreement which contains the *physical document* describing the French formula." Dkt. #265 at p. 13, n.6 (emphasis in original). Plaintiffs argue it is undisputed the French formula was written and placed inside a sealed envelope and also reference a photograph of the sealed envelope which Defendants attached to their August 20, 2019 response to Plaintiffs' Emergency Motion to Amend Scheduling Order, Continue Trial, Extend Other Deadlines, and for Sanctions. *Id.* at p. 11, n. 5 (citing Dkt. #254-3).

By referencing in their objections the photograph of the sealed envelope, Plaintiffs have opened the door to discussion of Defendants' assertions in their August 20, 2019 response regarding an unsuccessful mediation, which the Court would not ordinarily mention. Because Plaintiffs mention the photograph, the Court finds additional context from Defendants' August 20, 2019 response is necessary.[13]

---

[13] According to Defendants' August 20, 2019 response (Dkt. #254) to Plaintiffs' Emergency Motion to Amend Scheduling Order, Continue Trial, Extend Other Deadlines, and for Sanctions (Dkt. #248), on June 12, 2018, the day after StoneCoat filed an adversary complaint in Mergaux's bankruptcy wherein StoneCoat revealed its knowledge related to the transfer of the French formula to Profanchik following the Hopkins State Litigation, Morrison and Profanchik participated in a second mediation with Judge Joe Kendall in an attempt to finalize a verbal settlement originally discussed at the first mediation with Judge Kendall on April 13, 2018. In their response, Defendants represented that during that mediation, the French formula, "in its original yellow envelope, was delivered to Judge Kendall's office and shown to Morrison and his attorney as part of the negotiations." Dkt. #254 at p. 4.

In their response, Defendants also referred to the attached photograph of the envelope containing the French formula, noting the face of the envelope stated "Original Formula: Product Rights, Formula Purchase and Royalty Agreement and Escrow Agreement. Dec. 21, 2011. StoneCoat GP, LLC," and the back of the envelope was signed and sealed with wax. *Id.* According to Defendants, because the negotiations fell apart, the signed and sealed envelope containing the French formula was never delivered to Morrison. *Id.*

Contrary to Plaintiffs' assertions in their objections as to the newly discovered evidence establishing Profanchik converted the physical envelope, Plaintiffs' reference to the photograph (when considered in context) suggests Plaintiffs

Regardless of the timing of Plaintiffs' knowledge of Profanchik's possession of the physical envelope and Plaintiffs' failure to specifically present their conversion claim as relating to the physical envelope containing the physical papers describing the formula, Plaintiffs' conversion claim still fails because Plaintiffs' objections make clear the claim is based on trade secret misappropriation. As noted above, TUTSA's preemption provision provides that the statute "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *ScaleFactor, Inc. v. Process Pro Consulting, LLC*, No. 1:19-CV-229-RP, 2019 WL 2719416, at *2 (W.D. Tex. June 28, 2019) (quoting TEX. CIV. PRAC. & REM. CODE § 134A.007(a)). Excepted from the provision are "contractual remedies" and "other civil remedies that are not based upon misappropriation of a trade secret." *ScaleFactor*, 2019 WL 2719416, at *2 (quoting TEX. CIV. PRAC. & REM. CODE § 134A.007(b)(1), (2)).

In *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577 (W.D. Tex. Mar. 2, 2016), the crux of the plaintiff's lawsuit was its claim for trade secret misappropriation. *Id.* at *1. The defendants moved for summary judgment on the plaintiff's trade secret misappropriation claim and also sought summary judgment on the plaintiff's remaining claims, arguing those claims were preempted by TUTSA. *Id.* at *3. The court agreed in part and granted the defendants' summary judgment motion as to the plaintiff's claims for conversion, unjust enrichment, and constructive trust. *Id.* However, the court found the plaintiff's remaining claims for breach of contract, tortious interference with contract, breach of fiduciary duty, and conspiracy survived summary judgment. *Id.* at *7 (finding that while the plaintiff's breach of fiduciary duty

---

have long been aware of the physical envelope in Profanchik's possession.

claim depended in part on Truman's alleged use of trade secret information, there were facts unrelated to the plaintiff's misappropriation claim which could support the plaintiff's breach of fiduciary duty claim).

Relevant to our discussion here, the court in *360 Mortgage Group* stated most courts have determined UTSA was intended to preempt a claim for conversion of trade secrets. *Id.* (citing *New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 534 n.6 (S.D. Miss. 2013) (collecting cases which hold that UTSA preempts a plaintiff's claim for conversion of confidential, proprietary, or trade secret information); *Nova Design Technologies, Ltd. v. Walters*, 875 F. Supp. 2d 458 (E.D. Pa. 2012) (holding the plaintiff's conversion claim based on trade secret misappropriation was preempted by UTSA); *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940-41 (S.D. Ohio 2012) (same); *B & F Sys., Inc. v. LeBlanc*, Civ. No. 7:07-CV-192 (HL), 2011 WL 4103576, at *27 (M.D. Ga. Sept. 14, 2011) (same)). Noting the plaintiff's claim for conversion in *360 Mortgage Group* was premised on the same facts as its claim for trade secret misappropriation, the court in that case agreed that a claim for conversion of trade secrets is preempted by TUTSA. *360 Mortgage Group*, 2016 WL 900577, at *7. Additionally, to the extent the plaintiff claimed the defendants "converted confidential and propriety information in addition to trade secret information," the court found the plaintiff's conversion claim was still preempted, noting "[m]ost courts considering this question have determined UTSA was intended to preempt all claims based upon the unauthorized use of information." *Id*. at *8.

Similarly here, Plaintiffs' claim for conversion of the physical envelope containing physical papers describing the French formula is based on the same facts as those underlying its claims for misappropriation of trade secrets. It only involves an alleged trade secret. Thus, the Court finds

36

Plaintiffs' "conversion claim is wholly preempted." *Id.*

The effect of the TUTSA's preemption provision is less clear for Plaintiffs' unfair competition claim (Count 9), which is founded on the alleged use of both trade secrets and confidential information.[14] In *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, 1:17-CV-444-RP, 2018 WL 315753 (W.D. Tex. Jan. 5, 2018), the court reviewed "the reasoning in *Super Starr* and that of various other courts across the country applying Uniform Trade Secrets Act preemption" and concluded that "TUTSA's preemption provision encompasses *all claims based on the alleged improper taking of confidential business information.*" *Embarcadero*, 2018 WL 315753, at *3 (emphasis added). The court stated it was not the first to come to this conclusion, noting "[m]ost courts considering [the scope of TUTSA preemption] have determined [TUTSA] was intended to preempt all claims based upon the unauthorized use of information." *Id.* (quoting *360 Mortgage Group,* 2016 WL 900577, at *8; other citations omitted).

The Court also finds *ScaleFactor* instructive. The central issue in that case was whether the plaintiff's TUTSA claim preempted its four state-law claims of conversion, breach of fiduciary duty, misrepresentation, and violations of the Harmful Access by Computer Act ("HACA"). *ScaleFactor*, 2019 WL 2719416, at *1-*2. Taking the same approach to TUTSA preemption as the court in *360 Mortgage Group*, the court in *ScaleFactor* found the plaintiff's conversion and HACA claims were both preempted, even though the conversion claim included the loss of confidential, proprietary, and trade secret information. *ScaleFactor*, 2019 WL 2719416, at *2. The court stated a tort claim is

---

[14] In their response to Villarreal's and Gonzalez's motion for summary judgment, Plaintiffs state Defendants engaged in "unfair competition" and conspiracy with Kinser, Profanchik, ProCal, Mergaux, and Chamielec to engage in unfair competition against Plaintiffs. Dkt. #148 at p. 5. Specifically, Plaintiffs assert Defendants obtained trade secrets and confidential information from Plaintiffs and then used the trade secrets and confidential information to directly compete against Plaintiffs despite their promises that they would not do so. *Id.*

preempted by TUTSA if it is "based on the unauthorized use of information"—trade secret or not. *Id.* (quoting *Embarcadero*, 2018 WL 315753, at *2 (quoting *360 Mortgage Group*, 2016 WL 900577, at *8)).

Here, Plaintiffs' unfair competition claim is "fundamentally concerned" with the unauthorized acquisition of StoneCoat information, "some but not all of which is trade-secret." *ScaleFactor*, 2019 WL 2719416, at *2. The harm stemming from this claim and Plaintiffs' TUTSA claim is the same – the taking of Plaintiffs' confidential information. Like the conversion claim, the Court finds Plaintiffs' unfair competition claim is preempted by TUTSA.

The Court now considers whether Plaintiffs' remaining tortious interference claim against Profanchik and ProCal regarding their alleged interference with the Product Rights Agreement is also preempted. Another federal court examining *Super Starr* recently held that Texas state court opinion, notwithstanding its specific reference to trade secrets, "is properly understood as requiring preemption both where a tort claim depends on the misappropriation of trade secrets alone, and where such a claim is dependent on the misappropriation of either trade secrets or confidential information." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 1796293, at *13 (E.D. Va. Apr. 16, 2018). The court discussed two Texas federal court cases preceding *Super Starr*, *Downhole Technology, LLC v. Silver Creek Servs., Inc.*, No. H-17-0020, 2017 WL 1536018 (S.D. Tex. April 27, 2017) and *AMID*, 241 F. Supp. 3d at 827, both of which suggested the TUTSA preemption provision should not be applied to dismiss claims prematurely and also refused to dismiss as preempted certain tort claims that relied on the alleged misappropriation of both trade secrets and confidential information. *Steves & Sons*, 2018 WL 1796293, at *12, *14. Pointing out those courts lacked the guidance of Texas courts in how to interpret that provision, the court in

*Steves & Sons* found the more recent case of *Embarcadero* "far more persuasive." *Id.* at *14. Considering "the TUTSA preemption provision in the broad manner suggested by *Super Starr* and *Embarcadero*," the court held the defendant's tortious interference counterclaims should be dismissed on preemption grounds. *Id.*

Plaintiffs' remaining tortious interference claim regarding the Product Rights Agreement also appears to be based upon the same facts as their alleged misappropriation of trade secrets claims. Plaintiffs allege Mergaux and Chamielec were not permitted under the terms of the Product Rights Agreement to disclose the French formula or to sell the French formula to any person, including Profanchik and ProCal. Dkt. #265 at pp. 26-27. According to Plaintiffs, Profanchik learned about the Product Rights Agreement and the French formula sold by Mergaux and Chamielec to StoneCoat GP in March 2015 during his negotiations and due diligence for the purchase of assets from SCOT. *Id.* at 27.

Relying on new evidence submitted with the objections, Plaintiffs assert Profanchik appeared at the jury trial in the Hopkins State Litigation and attempted to present himself as an expert witness for Mergaux, but the judge excluded him as a witness. *See* Dkt. #265-19. That same day, the jury found Mergaux breached the Product Rights Agreement.[15] According to Plaintiffs, two days later "Profanchik solicited and obtained from Mergaux the French formula described in the Product Rights Agreement for the amount of $5,000." Dkt. #265 at p. 27 (citing Dkt. #265-12). On June 21, 2016, Profanchik obtained from Chamielec a sworn statement that Profanchik had acquired the

---

[15] There is no indication in the verdict form what part of the Product Rights Agreement the jury found breached. Jury Charge from Hopkins State Litigation (Dkt. #67-18) at p. 4. Mergaux states in his April 17, 2019 declaration the jury found he breached the Product Rights Agreement "by terminating it prematurely." Mergaux Decl. (Dkt. #175-1), ¶ 8.

French formula for the payment of $120,000. Dkt. #265-15. On March 9, 2016, Profanchik entered into the Letter of Intent describing Chamielec's sale and Profanchik's purchase of the French formula. Dkt. #265-4. On September 15, 2016, Profanchik entered into a contract with Chamielec wherein Profanchik purchased all of the formulas and intellectual property relating to sprayed limestone for a price of $125,000. Dkt. #265-1. Plaintiffs emphasize the formula being sold to Profanchik by Chamielec on September 15, 2016 was the French formula which was subject to the Product Rights Agreement. Dkt. #265 at p. 28. Relying on this new evidence, as well as Profanchik's August 6-7 deposition testimony, Plaintiffs assert the R&R's conclusion that Plaintiffs have not offered evidence that Profanchik knowingly induced Mergaux and Chamielec to breach the Product Rights Agreement is erroneous.

At its core, Plaintiffs' tortious interference claim is that Profanchik induced Mergaux and Chamielec to breach the Product Rights Agreement by disclosing/selling the French formula. Because this claim is based on the alleged taking of Plaintiffs' purported trade secret, it is also preempted by TUTSA, which preempts all claims based on the alleged improper taking of trade secret and confidential business information.[16] *See Am. Mortg. & Equity Consultants, Inc. v. Bowersock*, No. 1:19-CV-432-RP, 2019 WL 2250170, at *5 (W.D. Tex. May 24, 2019), *reconsideration denied*, No. 1:19-CV-492-RP, 2019 WL 4087400 (W.D. Tex. June 21, 2019) (citing

_____

[16] Even if the claim is not preempted, the Court finds insufficient evidence to create a genuine issue of material fact on all four essential elements. To prevail on a claim for tortious interference, a plaintiff must show: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Marek Brother Sys., Inc. v. Enriquez*, No. 3:19-CV-01082, 2019 WL 3322162, at *5 (N.D. Tex. July 24, 2019) (quoting *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)). The Court is not convinced there is sufficient evidence, even including the new evidence incorporated into the objections, that creates a genuine issue of material fact regarding the first element (that the 2011 Product Rights Agreement was an existing contract subject to interference following the Hopkins State Litigation trial) and the third and fourth elements (causation and damages). The Court addresses Plaintiffs' damages evidence in its discussion below on Plaintiffs' trade secret misappropriation claims.

*Embarcardero*, 2018 WL 315753, at *3 and finding the plaintiff's tortious interference claim preempted by TUTSA, or alternatively, that the plaintiff waived and abandoned its tortious interference claim with respect to its request for temporary injunctive relief).

For these reasons, the Court grants summary judgment against Plaintiffs' conversion, unfair competition, and remaining tortious interference claims. The Court now considers Plaintiffs' trade secret misappropriation claims against Profanchik, ProCal, and Kinser.

### *Trade secret misappropriation claims against Profanchik, ProCal and Kinser*

In the underlying briefing before the Magistrate Judge, the parties did not present separate arguments addressing Plaintiffs' claims under the DTSA and the TUTSA. In two sentences in their objections, Plaintiffs object to the R&R because it does not separately address Plaintiffs' DTSA claims. Dkt. #265 at p. 13. This objection is without merit.

In the August 12 R&R, the Magistrate Judge noted the DTSA's definition of "trade secret" is functionally identical to TUTSA's definition and considered Plaintiffs' federal and state trade secret misappropriation claims together because they will likely require proof of the same elements.[17]

---

[17] Under DTSA, "misappropriation" means

(A) acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief

Dkt. #241 at p. 114 (citations omitted). According to the Magistrate Judge, to show a party misappropriated a trade secret, the plaintiff must establish: (1) the information is a trade secret; (2) the defendant acquired the secret through improper means; and (3) the defendant's use of the secret resulted in harm to the plaintiff. *Id.* (citing *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 702 (W.D. Tex. 2019 (citing *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004))).

Without citing specific authority in their objections, Plaintiffs argue, as they did before the Magistrate Judge, that the TUTSA (or the DTSA) does not require use of the trade secret to be actionable.[18] As discussed below, there is some case law in support of this argument. Even so, considering the current state of the law on this issue as set forth by the Fifth Circuit Court of

to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake.

*McAfee, LLC v. Kinney*, No. 4:19-CV-463, 2019 WL 4101199, at *5 (E.D. Tex. Aug. 29, 2019) (quoting 18 U.S.C. § 1839(5)). "Misappropriation" and "improper means" have the same definitions under the federal and Texas acts. *McAfee*, 2019 WL 4101199, at *5, n. 3 (comparing 18 U.S.C. § 1839(5) with TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3)).

[18] In their underlying briefing, Plaintiffs argued the TUTSA only requires that the defendant be in possession of proprietary information and in a position to use it. *See, e.g.* Dkt. #148 at pp. 22-23 (citing *Fox v. Tropical Whs., Inc.*, 121 S.W.3d 853, 860 (Tex. App. – Fort Worth 2003, no pet.)). The Magistrate Judge was not persuaded by that argument, and she noted the *Fox* case relied upon by Plaintiffs concerned entry of an injunction. Dkt. #241 at p. 151 (also citing *Hughes v. Age Indus., Ltd.*, 2017 WL 943423, at *5 (Tex. App. – San Antonio Mar. 8, 2017, no pet.) ("Because the very purpose of an injunction is to prevent disclosure of trade secrets pending trial, an applicant is not required to show the defendant is actually using the information. . . . Instead, the applicant must show the defendant possesses the trade secrets and is in a position to use them.").

The Magistrate Judge stated a federal court in the Fifth Circuit recently explained that "Texas law provides that both actual and threatened misappropriation may be enjoined; thus, "the weight of case law supports the entry of an injunction upon a showing that a defendant probably, rather than actually, disclosed trade secrets." Dkt. #241 at p. 152 (quoting *TFC Partners, Inc. v. Stratton Amenities, LLC*, No. 1:19-CV-58-RP, 2019 WL 369152, at *3 (W.D. Tex. Jan. 30, 2019) (citing *Cardoni v. Prosperity Bank*, 805 F.3d 573, 590 (5th Cir. 2015) (holding that a district court correctly "made an individualized assessment of whether disclosure had occurred or was likely to occur in this case"))).

Appeals, numerous district courts, and some Texas state courts, the Court finds the Magistrate Judge properly considered whether Plaintiffs submitted sufficient evidence of Profanchik/ProCal's and Kinser's use of the French formula.

Recent opinions from federal district courts involving TUTSA and DTSA list "use" as a required element for both trade secret misappropriation claims. For example, in *Marek Brother Sys., Inc. v. Enriquez*, No. 3:19-CV-01082, 2019 WL 3322162 (N.D. Tex. July 24, 2019), the court noted that to state a claim under the DTSA, a plaintiff must allege: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce. *Id*. at *3 (citing 18 U.S.C. § 1836; also citing *Blue Star Press, LLC v. Blasko*, No. SA-17-CA-111-OLG (HJB), 2018 WL 1904835, at *2 (W.D. Tex. Mar. 6, 2018)). According to the court, to establish trade secret misappropriation under Texas law, a plaintiff must similarly show: (1) a trade secret; (2) the defendants acquired the trade secret by breach of a confidential relationship or other improper means; and (3) the defendants used the trade secret without authorization. *Marek Brother*, 2019 WL 3322162, at *3 (citing *Gen. Univ. Sys., Inc. v. HAL, Inc*., 500 F.3d 444, 449 (5th Cir. 2007) (citations omitted)).

Similarly, in *M-I L.L.C. v. Q'Max Sols., Inc*., No. CV H-18-1099, 2019 WL 3565104 (S.D. Tex. Aug. 6, 2019), the court considered the plaintiff's federal DTSA and state TUTSA trade secret misappropriation claims together and listed the same elements used in several recent opinions by the Court.[19] According to the court in *M-I*, "[t]o prevail on a misappropriation of trade secrets claim, a

---

[19] In three recent opinions considering preliminary injunctions, the Court has stated that use is a required element under both statutes. According to the Court in *AHS Staffing, LLC v. Quest Staffing Grp., Inc*., 335 F. Supp. 3d 856 (E.D. Tex. 2018), "[t]rade secret misappropriation under Texas law is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff." *Id.* at 862 (quoting *Wellogix, Inc. v. Accenture, L.L.P,* 716 F.3d 867, 874 (5th Cir. 2013) (quotations omitted).

Around the same time, the Court stated under DTSA, "[a] claim for misappropriation of trade secrets requires: (1) a trade secret; (2) misappropriation; and (3) use in interstate commerce." *SPBS, Inc. v. Mobley*, No. 4:18-CV-00391,

43

plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *Id.* at *3 (quoting *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018) (internal quotation marks omitted)).[20]

There are other courts, however, that have held TUTSA, when properly read, does not contain a "use" requirement. In *Sears Authorized Hometown Stores, LLC v. Y&O WF, LLC*, No. 7:18-CV-00083-O-BP, 2018 WL 6608354 (N.D. Tex. Nov. 29, 2018), *report and recommendation adopted*, No. 7:18-CV-00083-O-BP, 2018 WL 6603813 (N.D. Tex. Dec. 17, 2018), the defendant

---

2018 WL 4185522, at *3 (E.D. Tex. Aug. 31, 2018) (quoting 18 U.S.C. § 1836(b)(1)). According to the Court, Texas has adopted TUTSA, which has similar elements to the federal act. *SPBS*, 2018 WL 4185522, at *3 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002; also citing *Wellogix*, 716 F.3d at 874). Under TUTSA, a plaintiff needs to show use without authorization, but not that it was used in interstate commerce. *SPBS*, 2018 WL 4185522, at *3 (citing *Wellogix*, 716 F.3d at 874).

 A few weeks ago, the Court again stated that to prevail on a trade secret misappropriation claim under Texas law, "a plaintiff must show: '(1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff.'" *Keurig Dr Pepper Inc. v. Chenier*, No. 4:19-CV-505, 2019 WL 3958154, at *3 (E.D. Tex. Aug. 22, 2019) (quoting *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Gaia Techs. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 376 (5th Cir. 1999))).

[20] The plaintiff in *GE Betz* brought an action against a former employee and competitor for breach of a non-solicitation covenant and misappropriation of trade secrets under Texas law. Following a jury trial on certain claims, wherein the jury found liability but awarded no damages, GE appealed the district court's denial of its motion for summary judgment regarding its claim for misappropriation of trade secrets and three related causes of action. *GE Betz*, 885 F.3d at 323. On appeal, the Fifth Circuit emphasized the third essential element of a misappropriation of trade secrets claim is that the "defendant *used* the trade secret without authorization from the plaintiff" and further noted a "cause of action for misappropriation of trade secrets accrues when the trade secret is *actually used*." *Id*. at 325-26 (emphasis in original) (citations omitted). The court noted GE requested the court "collapse the improper-acquisition prong and the use prong of the misappropriation of trade secrets cause of action," citing only an unpublished case from a Texas courts of appeals reviewing the trial court's ruling with great deference. *Id*. at 327. The Fifth Circuit concluded there was no evidence of actual use and affirmed the district court's grant of summary judgment on the misappropriation of trade secrets claim. *Id*.

 It is unclear from the Fifth Circuit's opinion whether the trade secret misappropriation claim was brought pursuant to TUTSA. However, a review of the underlying opinion reveals the case was filed in February 2013, before TUTSA became effective on September 1, 2013. *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 681 (S.D. Tex. 2014), *aff'd in part sub nom. GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318 (5th Cir. 2018).

sought dismissal of Sears' claim for misappropriation of trade secrets under Rule 12(b)(6), arguing that "use" of a trade secret is a required element of a misappropriation claim under the TUTSA. *Id.* at *2. Sears argued there was no such requirement, but even if there were, Sears argued it had properly alleged the defendant used its trade secrets by refusing to return them to Sears. *Id.*

The court first distinguished the court's decision in *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013), wherein the Fifth Circuit listed "use" as an element of a misappropriation of trade secret claim in Texas. *Id.* The court noted the claims asserted in *Wellogix* were a common law claim for misappropriation and a statutory claim for theft of trade secrets under the TTLA, not a claim under TUTSA as alleged by Sears. *Id.* The court further noted TUTSA, which became effective on September 1, 2013, was not in effect when the Fifth Circuit decided *Wellogix* on May 15, 2013. *Id.*

The defendant also relied on other district court cases, but the court stated those cases repeated "the *Wellogix* formulation of a misappropriation of trade secret claim without closely examining TUTSA's text." *Id.* at *3 (citations omitted). According to the court, the analysis of TUTSA that most closely follows the text of the statute appears in *His Company, Inc. v. Stover*, 202 F. Supp. 3d 685 (S.D. Tex. 2016), *vacated as moot*, No. 4:15-CV-00842, 2016 WL 6134939 (S.D. Tex. Sep. 8, 2016). In *Stover*, Judge Harmon considered whether TUTSA requires "improper means" of acquisition for liability. *Id.* at 691-92. Judge Harmon listed the elements of a statutory misappropriation claim under TUTSA and then stated, in contrast, there were three elements of a trade secret misappropriation claim that "were, and continue to be, frequently recited and interpreted

with a subtle, but important variation that influences liability."[21]  *Id.* at 692.

She noted many district courts in Texas continue to "parrot the common law elements" of misappropriation "without regard to the text or intent of" TUTSA.  *Id*. at 693.  In evaluating the statute, she considered TUTSA's text "holistically, accounting for the 'full text, language as well as punctuation, structure, and subject matter.'" *Id.* at 693-94 (quoting *Elgin Nursing & Rehab. Ctr. v. U.S. Dept. of Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir.2013) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993))).  Noting the three disjunctive "ors" and five semi-colons employed in the definition of misappropriation, Judge Harmon found the construction indicated there are "multiple, equal paths to liability under the statute."  *Id.* at 693.  She concluded there are "actually six alternative paths to liability under TUTSA," at least one of which does not require that the trade secret be acquired by improper means.[22]  *Id*. at 694-95.

These are the same "six discrete forms" of "misappropriation" the Texas appellate court in

---

[21] "One variation indicates that a defendant must have acquired the trade secret in a particular manner, i.e., there is only one path to liability focused on whether the means used to acquire the trade secret were improper." *Stover*, 202 F. Supp. 3d at 692.  "In other cases, however, the recitation of the elements suggests that there are two paths to liability, *either* by acquiring the trade secret through improper means *or* using or disclosing a trade secret in breach of a confidential relationship."  *Id.* (emphasis in original).

[22] The court in *Sears* agreed with the court's interpretation of TUTSA explained in *Stover*.  *Sears*, 2018 WL 6608354, at *4.  According to the court, under "this reading of the statute, Sears was not obligated to allege that Y&O used its trade secrets to state a valid claim for misappropriation."  *Id.*  Rather, Sears could properly state a claim under TUTSA by alleging Y&O acquired its trade secrets by improper means, which it had done.  *Id.*  The court further found that even if TUTSA requires "use" as a necessary element, Sears had properly pleaded that Y&O used its trade secrets by "taking control of them and holding them hostage."  *Id.* ("Although the parties have not cited a case on the exact point that refusing to return trade secrets may qualify as 'use,' and the Court's research has not revealed such a case, it seems reasonable that refusal to return trade secrets in an effort to gain leverage over another party, such as what Sears alleged Y&O did in this case, suffices as commercial use of trade secrets to the potential disadvantage of Sears.").

*Super Starr*, discussed above, later outlined:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means [Form 1]; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) used improper means to acquire knowledge of the trade secret [Form 2];
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>>
>> (a) derived from or through a person who had utilized improper means to acquire it [Form 3];
>>
>> (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use [Form 4]; or
>>
>> (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use [Form 5]; or
>>
>> (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake [Form 6].

*Super Starr*, 531 S.W.3d at 844 (quoting TEX. CIV. PRAC. & REM. CODE ANN.§ 134A.002(3)).

According to the court in *Super Starr*, each of these forms of "misappropriation" involve some combination of acquisition, disclosure, or use of a trade secret, paired with other circumstances. *See id.* However, there are other Texas appellate courts that list "use" of the alleged trade secret as critical to a TUTSA claim. *See Goldberg v. EMR (USA Holdings) Inc*., No. 05-18-00261-CV, 2019 WL 3955771, at *12, *14 (Tex. App. – Dallas Aug. 22, 2019) (citing *Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc*., 571 S.W.3d 346, 360 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("To establish misappropriation of trade secrets under Texas law, a plaintiff must show the existence of a trade secret that the defendant acquired through a breach of a confidential relationship or through other improper means and that the secret was used without authorization, resulting in

damages to the plaintiff.")); *see also Neurodiagnostic Consultants, LLC d/b/a Synaptic Res. of Austin, LLC, a Texas Ltd. Liab. Co. v. Melody Nallia, an individual, et al.*, No. 03-18-00609-CV, 2019 WL 4231232, at *8 (Tex. App. – Austin Sept. 6, 2019) ("To prove an action for misappropriation of trade secrets, a plaintiff must establish (1) the existence of a trade secret; (2) acquisition of the trade secret through a confidential relationship or discovery of it by improper means; (3) use of the trade secret without authorization; and (4) resulting damages to the plaintiff.").

Significantly, on August 13, 2019 (the day after the Magistrate Judge entered the R&R), the Dallas appellate court affirmed the district court's grant of summary judgment against Morrison's and SCOT's misappropriation of trade secrets counterclaim against Profanchik in the Collin County Litigation. *Morrison v. Profanchik*, No. 05-17-01281-CV, 2019 WL 3798182 (Tex. App. – Dallas Aug. 13, 2019). The court listed the elements of a claim for violation of TUTSA as (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury to the plaintiff or unjust enrichment to the defendant. *Id.* at *3 (citations omitted). However, the court also cited *Universal Plant Servs.,* 571 S.W.3d at 360, for the proposition that to establish misappropriation of trade secrets under Texas law, "a plaintiff must show the existence of a trade secret that the defendant acquired through a breach of a confidential relationship or through other improper means *and that the secret was used without authorization*, resulting in damages to the plaintiff." (emphasis added).

As noted above, the scope of the TUTSA is a question of Texas law. The Court's research has located more Texas cases requiring use of an alleged trade secret (even when the trade secret misappropriation claim is clearly asserted under TUTSA) than cases eliminating such a requirement. Considering this, and further considering the many federal courts interpreting TUTSA (and DTSA) and listing use as an essential element, the Court is not convinced the Magistrate Judge erred.

If "use" is a required element, Plaintiffs alternatively argue the "newly disclosed evidence" incorporated into the objections (i.e., that Profanchik/ProCal's solicitation of customers by referring to the French formula in their marketing and promotion materials) creates a genuine issue of fact regarding their use of Plaintiffs' alleged trade secret (the French formula). *See* Dkt. #265 at pp. 15-18. This Court has held "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *SPBS*, 2018 WL 4185522, at *7; *Keurig*, 2019 WL 3958154, at *5 (quoting *GE Betz*, 885 F.3d at 326 (quoting *Wellogix, Inc.*, 716 F.3d at 877)). In *Wellogix*, the Fifth Circuit explained that "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or *soliciting customers through the use of information that is a trade secret . . .* all constitute 'use.'" *Wellogix,* 716 F.3d at 877 (quoting *Gen Universal Systems*, 500 F.3d at 451) (quoting Restatement (Third) of Unfair Competition § 40 (1995)) (emphasis added))). Assuming that "use" is an essential element of Plaintiffs' trade secret misappropriation claims, the Court finds Plaintiffs' new evidence is sufficient to create a genuine issue of material fact that Profanchik and ProCal Stone Design used the French formula. Although it would have been unreasonable for a jury to infer use of the French formula on the record before the Magistrate Judge, the record as supplemented with the new evidence incorporated into the objections is sufficient to create a genuine issue of material fact as to Profanchik's and ProCal Stone Design's (but not the remaining ProCal entities' or Kinser's) use of the French formula.[23]

---

[23] In the Declaration of John D. Profanchik, Sr. ("Profanchik Decl."), attached as Exhibit 2 to ProCal USA and ProCal Enterprises' motion for summary judgment, Profanchik states ProCal USA and ProCal Enterprises were created on May 2, 2016 and September 1, 2016, respectively, to create franchising and/or distributorship opportunities for ProCal Stone Design. Profanchik Decl. (Dkt. #195-2), ¶ 21. According to Profanchik, he hired Jeffrey Seeberger, who had extensive experience in growing franchises, around June 2016 for a "set salary plus reimbursement for expenses." *Id.*,

The Court grants Kinser's motion for summary judgment and ProCal USA/ProCal Enterprises' motion for summary judgment regarding the TUTSA and DTSA misappropriation of trade secret claims against them. The Court now considers whether there is sufficient evidence Plaintiffs suffered any injury.[24]

### The parties' assertions

As an overarching ground for summary judgment, Defendants asserted all Plaintiffs' claims should be dismissed because Plaintiffs' damages calculations are flawed and without evidentiary support. According to Defendants, Plaintiffs are seeking a variety of damages from Defendants, and the pleadings have failed to segregate or allocate any particular damages that resulted from any specific defendant's alleged conduct.[25] Defendants point out the damages Plaintiffs are seeking in this lawsuit are identical to the damages sought in the Collin County Litigation.[26] *See* Dkt. #127-1,

---

¶¶ 21-22. Working together, Seeberger and Profanchik, with the assistance of attorneys Gray, Plat & Mooty in Washington, D.C., created franchise disclosure documents, franchise agreement templates, and other documents required by the various franchise laws. *Id*., ¶ 22. Despite their best efforts, neither ProCal USA nor ProCal Enterprises sold a franchise or distributorship, and Seeberger and Profanchik "parted ways" around March 2017, after Profanchik had spent over $100,000 in trying to grow the franchise business. *Id*., ¶ 23.

According to Profanchik, in 2016 and 2017, ProCal USA filed federal income tax returns showing no sales and no income. *Id*., ¶ 24. "Instead, ProCal USA had losses of $12,029 in 2016 and losses of $15,116 in 2017." *Id; see also* Exhibits 2(c) and 2(d) attached thereto. ProCal Enterprises did not file a return during this same period of time because it had no business activity. Profanchik Decl., ¶ 24. Since Seeberger left, ProCal USA and ProCal Enterprises have had no "real business operations," including no sales, no income, and no bank account. *Id*., ¶ 25.

[24] Because the Magistrate Judge found there is insufficient evidence Defendants ever used the French formula, as currently required for misappropriation of trade secrets claims, she did not need to consider whether Plaintiffs would be able to show they sustained damages as a result of any use of the French formula. Dkt. #241 at p. 160, n. 54.

[25] Arguing Plaintiffs' damages calculations are flawed, Defendants specifically argue as follows: (1) $500,000 is not the fair market value of the alleged proprietary or trade secret information; (2) $120,000 plus $25/bag is not a reasonable license or franchise fee; (3) Plaintiffs' lost profits analysis is fundamentally flawed; and (4) the liquidated damages provision is an unenforceable penalty. According to Defendants, Plaintiffs have failed to calculate their lost profits, which Morrison claims to be $816,032, as required by law, and they have no evidence to support that request, such as evidence of a lost sale or customer.

[26] In its August 13, 2019 order affirming the district court's grant of summary judgment against Morrison's and SCOT's counterclaims against Profanchik in the Collin County Litigation, the Dallas court of appeals stated appellants

Ex. 16 (Morrison's and SCOT's expert disclosures from the Collin County Litigation).

Defendants separately moved to strike the expert testimony of Morrison as a non-retained expert witness, making numerous specific objections to Morrison's qualifications and the reliability of Morrison's opinions, especially regarding lost profits and other alleged damages. Defendants also moved to strike portions of Morrison's affidavit primarily relied upon by Plaintiffs in the underlying briefing before the Magistrate Judge. In the June 28, 2019 Order granting Defendants' motion to strike expert witness testimony, the Magistrate Judge concluded allowing Morrison to be designated as an expert witness to testify to damages will not assist the jury to understand the evidence or to determine a fact in issue. Dkt. #224 at p. 32. Rather, it would confuse the jury and give undue significance to Morrison's damages related testimony. *Id.* at pp. 32-33. However, the Magistrate Judge noted Morrison is familiar with StoneCoat, how it operates, and how it was affected by the alleged actions of Defendants and may testify as a fact witness about his opinion regarding lost profits, the financial value of his business, and anything else within his direct personal knowledge.

In the second June 28, 2019 Order, which granted in part and denied in part Defendants' various motions to strike portions of Morrison's affidavit(s) relied upon in the summary judgment briefing, the Magistrate Judge set forth in detail Morrison's statements regarding damages. Dkt. #225 at pp. 32-37. The Magistrate Judge also set forth Defendants' various objections, which had been raised in the context of Rule 702 regarding expert testimony, to the reliability of the methodology and assumptions underlying Morrison's damages testimony. *Id.* at pp. 39-40. Those

---

did not even address on appeal Profanchik's no-evidence ground that they had no evidence of damages to support their misappropriation of trade secrets cause of action. *Morrison v. Profanchik*, No. 05-17-01281-CV, 2019 WL 3798182, at *5 (Tex. App. – Dallas Aug. 13, 2019). The court rejected appellants' attempt to present their damages argument in their reply brief after Profanchik pointed out their failure to do so in their opening brief. *Id.* at *8, n. 5.

objections are substantially similar to the arguments raised by Defendants in their motions for summary judgment for why Plaintiffs' damages calculations are flawed.

In the second June 28 Order, the Magistrate Judge noted Rule 701 applies and held Defendants' critiques of Morrison's opinions concern the weight, not the admissibility, of the testimony. *Id.* at p. 40 (citing *Everett Fin., Inc. v. Primary Residential Mortg.,Inc*., No. 3:14-CV-1028-D, 2018 WL 2441829, at *6 (N.D. Tex. May 31, 2018)). According to the Magistrate Judge, objections which concern the weight of the evidence are more properly presented during cross-examination. *Id.* (citing *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 374 (5th Cir. 2002) (holding that ability of counsel to challenge actual and expected production figures through cross-examination supported admission of testimony as lay opinion)). The Magistrate Judge was not convinced Morrison's "lack of precision" rendered his opinions entirely helpful to the jury, noting Defendants will have the opportunity at trial to deconstruct Morrison's numbers and expose the various assumptions on which they rest. Dkt. #225 at p. 41 (citations omitted).

Although the Magistrate Judge held Morrison may testify as a fact witness about his opinions regarding lost profits, the financial value of his business, and anything else within his direct personal knowledge, she held Morrison is not qualified to testify regarding Defendants' profits. *Id.* Thus, the Magistrate Judge granted Defendants' motion to strike Morrison's opinions regarding Defendants' profits. Otherwise, the Magistrate Judge denied Defendants' motion to strike Morrison's damages opinions, noting she would consider any remaining issues in her consideration of the motions for summary judgment. The Court now considers Morrison's damages opinions in the context of Plaintiffs' misappropriation of trade secrets claims against Profanchik and ProCal Stone Design regarding the French formula.

**Applicable law**

Under the TUTSA, a plaintiff is only required to show an injury if it seeks damages in
addition to injunctive relief. *Morgan v. Clements Fluids S. Texas, LTD*., No. 12-18-00055-CV, 2018
WL 5796994, at *8 (Tex. App. – Tyler Nov. 5, 2018) (citing TEX. CIV. PRAC. & REM. CODE ANN.
§ 134.A.004(a)).

> In addition to or in lieu of injunctive relief, a claimant is entitled to recover damages
> for misappropriation. Damages can include both the actual loss caused by
> misappropriation and the unjust enrichment caused by misappropriation that is not
> taken into account in computing actual loss. In lieu of damages measured by any
> other methods, the damages caused by misappropriation may be measured by
> imposition of liability for a reasonable royalty for a misappropriator's unauthorized
> disclosure or use of a trade secret.

TEX. CIV. PRAC. & REM. CODE ANN. § 134A.004 (West).

Plaintiffs seek damages and injunctive relief.[27] A "flexible and imaginative" approach is
applied to the calculation of damages in misappropriation-of-trade-secrets cases. *Sw. Energy Prod.
Co. v. Berry-Helfand*, 491 S.W.3d 699, 710 (Tex. 2016) (quoting *University Computing Co. v.
Lykes-Youngstown Corp.,* 504 F.2d 518, 538 (5th Cir. 1974)). "Damages in misappropriation cases
can therefore take several forms, including the value of the plaintiff's lost profits, the defendant's
actual profits from the use of the secret, the value a reasonably prudent investor would have paid for
the trade secret, the development costs the defendant avoided by the misappropriation, and a

---

[27] To be entitled to an injunction, a plaintiff must plead and prove (1) a wrongful act; (2) imminent harm; (3)
irreparable injury; and (4) no adequate remedy at law. *Goldberg v. EMR (USA Holdings) Inc*., No. 05-18-00261-CV,
2019 WL 3955771, at *20 (Tex. App. – Dallas Aug. 22, 2019) (citing *Leibovitz v. Sequoia Real Estate Holdings, L.P.*,
465 S.W.3d 331, 350 (Tex. App.—Dallas 2015, no pet.)).

reasonable royalty." *Sw. Energy Prod.*, 491 S.W.3d at 710-11 (citing *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012)). For claims accruing on or after September 1, 2013, the Texas Uniform Trade Secrets Act governs. *Sw. Energy Prod.*, 491 S.W.3d at 711, n. 7 (citing TEX. CIV. PRAC. & REM. CODE § 134A.001–.008). Remedies available under the TUTSA include injunctive relief; damages measured by actual loss plus unjust enrichment not included in computing actual loss; a reasonable royalty; and exemplary damages capped at two times actual damages. *Id.* (citing (citing TEX. CIV. PRAC. & REM. CODE §§ 134.003, .004).

Once a jury determines that a trade secret exists and was wrongfully misappropriated, the Fifth Circuit has noted that it is generally accepted that the measure of damages may be calculated by reference to patent cases. *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 962 (S.D. Tex. 2013) (citing *University Computing*, 504 F.2d at 535). The Fifth Circuit emphasized that the standard "is very flexible." *Id.* Some courts attempt to measure the loss suffered by the plaintiff.[28] *Id.* The Fifth Circuit observed, however, that "in most cases the defendant has utilized the secret to his advantage with no obvious effect on the plaintiff save for the relative differences in their subsequent competitive positions." *Id.* Thus "normally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret" such as through publication so that no secret remains. *Id.* Thus, "unless some specific injury to the plaintiff can be established—such as lost sales—the loss to the plaintiff is not a particularly helpful approach in assessing damages." *Ultraflo*, 926 F. Supp. 2d at 962 (quoting

---

[28] According to the Texas Supreme Court, loss of value to the plaintiff is usually measured by lost profits. *Sw. Energy Prod.*, 491 S.W.3d at 711 (citations omitted). To recover lost profits, a party must introduce "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992)). Reasonable certainty is required to prove lost profits. *Id.* (citing *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex.2002)).

*University Computing*, 504 F.2d at 536).

Where the secret has not been destroyed and where the plaintiff has not been able to show a specific injury, by analogy to patent law the appropriate measure of damages is not the loss to the plaintiff, "'but rather the benefits or profits, or advantages gained by the defendant in the use of the trade secret.'" *Id.* The benefit to the defendant can be measured in a variety of ways. *Id.* The defendant's profit is one way, although "the Supreme Court has held in a patent case that the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained in the mistaken belief that their theft would benefit them." *University Computing*, 504 F.2d at 536 (citing *In re Cawood Patent,* 94 U.S. 695, 24 L.Ed. 238 (1877)).

The reasoning behind this concept is "that the risk of defendants' venture, using the misappropriated secret, should not be placed on the injured plaintiff, but rather the defendants must bear the risk of failure themselves." *Ultraflo*, 926 F. Supp. 2d at 962 (quoting *University Computing*, 504 F.2d at 536). Therefore, "the law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage, provided that he does in fact put the idea to a commercial use," a measure dubbed the "reasonable royalty" standard by the Fifth Circuit. *Id.*

According to the Supreme Court of Texas, absent proof of a specific injury, the plaintiff can seek damages measured by a "reasonable royalty." *Sw. Energy Prod.*, 491 S.W.3d at 711 (citing *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1208 (5th Cir.1986) and *University Computing,* 504 F.2d at 536–39). "[B]ecause the precise value of a trade secret may be difficult to determine, 'the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the

misappropriation took place.'" *Sw. Energy Prod*., 491 S.W.3d at 711 (quoting *Mid–Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510–11 (6th Cir.2005)). The royalty is calculated based on a fictional negotiation of what a willing licensor and licensee would have settled on as the value of the trade secret at the beginning of the infringement. *Sw. Energy Prod*., 491 S.W.3d at 711 (citing *Metallurgical Indus.,* 790 F.2d at 1208; *University Computing,* 504 F.2d at 540). "A reasonable royalty is, in essence, a proxy for the value of what the defendant appropriated, but it is not simply a percentage of the defendant's actual profits. *Sw. Energy Prod*., 491 S.W.3d at 711 (citing *Metallurgical Indus.,* 790 F.2d at 1208; *University Computing,* 504 F.2d at 537).

The fact finder must have sufficient evidence to determine the value a reasonably prudent investor would pay for the trade secret, and to meet that standard, the plaintiff need only demonstrate "the extent of damages as a matter of just and reasonable inference," even if the extent is only an approximation. *Sw. Energy Prod*., 491 S.W.3d at 711-12 (quoting *DSC Comm's Corp. v. Next Level Comm's,* 107 F.3d 322, 330 (5th Cir.1997)). Damage estimates, however, cannot be based on sheer speculation. *Sw. Energy Prod*., 491 S.W.3d at 712 (citing *Metallurgical Indus.,* 790 F.2d at 1208). "If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable." *Id.*; *see also Burbage v. Burbage,* 447 S.W.3d 249, 260 (Tex.2014) ("We require *some* concrete basis for an estimate.") (emphasis in original).

### Analysis

Plaintiffs have not retained any expert on economic damages that Plaintiffs have sustained from Defendants' conduct. Plaintiffs' damages evidence consists of Morrison's conclusory and often contradictory affidavit. According to Morrison, pursuant to the Product Rights Agreement,

StoneCoat GP paid $500,000 to purchase the intellectual and confidential information and trade secrets, including the formula, from Mergaux. Morrison Aff., ¶ 69. Morrison opines the contract amount was negotiated between independent parties and was a fair and reasonable amount for the trade secrets and formula being purchased by Stonecoat GP. *Id.* In his opinion, the fair market value today of the trade secrets, formula and confidential information as described in the Product Rights Agreement is $500,000. According to Plaintiffs, Morrison has valued the fair market value of a reasonable royalty fee in the amount of $600,000:

> In my opinion, a reasonable royalty for the trade secrets, formula, and confidential information misappropriated by Defendants amount would be 20% of the gross revenue by Defendants. I have not been able to review all of the financial information produced by Defendants because Defendants designated the financial information AEO. Based on the information provided by Defendants, it is my opinion that Defendants had gross revenue in the amount of $1,745,631 through June 30, 2017. It is my opinion that Defendants have had, through January 31, 2019, gross revenue of $3 million. Calculating the 20% royalty on the gross revenue of $3 million results in a reasonable royalty fee of $600,000. It is my opinion that a reasonable royalty . . . in this case would be $600,000.

Morrison Aff., ¶ 72(F).

Morrison also opines as to lost profits as follows:

**C. Lost profits. $816,032.** Plaintiffs have suffered the recovery of lost profits as a result of the actions described of Defendants. Plaintiffs cannot calculate the exact amount of the lost profits until the Defendants provide the financial information requested from the Defendants regarding the business of Defendant John Profanchik and his business - Procal. I do not know, the exact amount of gross receipts and sales that Plaintiffs lost to Defendants as a result of Defendants' actions described herein because I do not have access to the AEO financial documents designated by Defendants. In addition, it is my understanding that Defendants have failed and refused to comply with discovery request to produce the financial records and information of Procal. Therefore, as of this date, Plaintiffs do not have the financial records from Defendants and Procal regarding the exact gross receipts, sales, revenue, cost of goods and cost of labor for the goods of Procal which would disclose the profits of Procal that were stolen and misdirected from Plaintiffs.

In my opinion, Plaintiffs suffered lost profits as a result of the actions of Defendants through July 31, 2017 in the amount of $816,032.

I calculate these lost profits based upon the expected and understood gross receipts, sales, gross revenue, cost of goods and labor of Procal from May, 2015 through July 31, 2017. During the period of May, 2015 through July 31, 2017, in my opinion Procal had gross receipts, sales, cost of goods and labor at least equal to the gross receipts, sales of the goods and labor of Plaintiffs and the cost of goods and labor were the same.

Based on Plaintiffs' 2014-2016 income tax returns, Plaintiffs had an average of 30% profit on gross receipts for a three-year period of time. Based on the 2014, 2015 and 2016 plaintiffs U.S. Form 1065 income tax returns, it is my opinion that Procal's gross receipts and sales less the cost of goods and labor would be as follows:

| | | |
|---|---|---|
| 2015 | $201,875 | (50% of plaintiffs 2015 Gross Profit - May 2015 - December 31, 2015) |
| 2016 | $387,889 | (100% of Stonecoat Gross Profit) |
| 2017 | $226,268 | (2016 Stonecoat Gross Profit divided by seven mos, Jan, 2017 - July 31, 2017) |

In my opinion, 30% profits on gross revenue is customary in the sprayed limestone business and in the industry which Plaintiffs and Defendants are involved. My opinions regarding the customary 30% profits margin are confirmed by three years of financial and tax return records of Plaintiffs. In my opinion, Defendants earned a 30% profit on defendants' gross revenue.

Total $816,032. In my opinion, the amount of $816,032 represents the lost profits of Plaintiffs as a result of the actions of Defendants. In my opinion $816,032 is the amount of profits lost by Plaintiffs through July 31, 2017 as a result of the actions of Defendants and this is the amount that Defendants earned as profits by calculating Defendants' gross receipts less Defendants' cost of goods and labor. Plaintiffs fixed cost during the time period in question did not change and would not change had Defendants not interfered with Plaintiffs' gross revenue.

Morrison Aff., ¶ 72(C).

In their motions for summary judgment, Defendants argue Morrison fails to identify the trade

secrets allegedly misappropriated and provides no reliable supporting data to justify the $500,000 figure. Additionally, although Morrison claims Plaintiffs paid $500,000 for the trade secrets, Defendants argue he ignores his prior sworn testimony wherein he admitted Plaintiffs never paid that full amount.

In their responses, Plaintiffs state Morrison "has valued the fair market value of the trade secrets at $500,000 based on his opinions of the value of the trade secrets and supported by arms-length fair market value commercial negotiation of a contract to purchase the trade secrets for $500,000." *See, e.g.* Docket Entry # 148 at 34. Plaintiffs clarify they are not claiming a franchise fee; rather, they are seeking damages measured by a reasonable royalty for misappropriation of a trade secret.

The Court finds instructive *Elcor Chem. Corp. v. Agri–Sul, Inc.,* 494 S.W.2d 204 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.), a Texas case involving the recovery of a defendant's profits for a misappropriation of trade secrets claim. In that case, the Dallas Court of Appeals held that although a defendant's profits are a "proper element[ ] of damages in a case involving the wrongful use of a trade secret," a plaintiff cannot recover damages without offering evidence "to show the actual profit made by [defendant]." *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 369 (5th Cir. 2010) (quoting Elcor, 494 S.W.2d at 214; also citing *Carbo Ceramics, Inc. v. Keefe,* 166 Fed. Appx. 714, 723 (5th Cir.2006) (unpublished) (interpreting Texas law to permit a plaintiff to "seek damages measured by the defendant's actual profits resulting from the use or disclosure of the trade secret"); also citing *Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.,* 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1996, no writ) (finding that, as a threshold requirement to recovering damages for trade secret and unfair competition claims, "a

plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant")).

In *MGE UPS Systems,* after the district court struck testimony from the plaintiff's damages expert in its entirety, MGE offered a final witness, MGE general manager O'Brien, who presented testimony related only to MGE's reasonable royalty damages. *Id.* at 367. O'Brien was never designated as an expert on damage calculations, and the district court ultimately found his testimony insufficient to permit MGE to offer a jury instruction on reasonable royalty damages.[29] *Id.* The only evidence remaining to support the plaintiff's damages claim was a chart showing the defendant's total revenues earned from all sources of income. The Fifth Circuit reversed the district court's denial of the defendants' Rule 50(a) motion on MGE's misappropriation of trade secrets claim for MGE's failure to prove damages and rendered a take-nothing judgment for MGE. *Id.* at 371. The problem in *MGE* was that the plaintiff had not presented evidence that provided "any means of distinguishing revenue [the defendant] gained from other sources from revenue gained through misappropriation of MGE's trade secrets, let alone a calculation of profits from the relevant portion of revenue." *Versata Software, Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841, 857 (E.D. Tex. 2012) (quoting *MGE*, 622 F.3d at 369).

---

[29] According to the court in *MGE*, "[t]ypically, to demonstrate reasonable royalty damages, a plaintiff presents evidence as to "'what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.'" *MGE*, 622 F.3d at 3697, n. 2. (quoting *University Computing,* 504 F.2d at 539). "However, O'Brien was only able to testify as to the royalty amounts that MGE would ask a competitor to pay to *prevent* that competitor from entering the UPS service industry—that is, staggeringly high royalty amounts that would price out competitors." *MGE*, 622 F.3d at 367, n. 2 (emphasis in original). According to the Fifth Circuit, such amounts are not cognizable as a "reasonable royalty" calculation at which a buyer and seller would agree to be market value for a particular piece of software. *Id.* (citing *Alcatel USA, Inc. v. Cisco Sys.,* 239 F.Supp.2d 660, 669 (E.D.Tex.2002) ("[T]his measure is to be calculated based on a reasonable royalty to which the parties *would have agreed* at the time of the alleged misappropriation. While the Court recognizes that some degree of speculation is inherent in calculating a suppositious licensing agreement between two parties that has never occurred, this hypothetical construct . . . must contain some degree of certitude." (emphasis added in *MGE*))).

These same problems exist with regard to Morrison's opinions as to a reasonable royalty. Plaintiffs have not presented evidence that provides "any means of distinguishing revenue [Profanchik or ProCal Stone Design] gained from other sources from revenue gained through misappropriation of [the French formula], let alone a calculation of profits from the relevant portion of revenue." *Id.*

Morrison also opines as to lost profits.[30] However, his opinions are not tied in any way to the portion, if any, of the lost profits which may have been caused by Profanchik's or ProCal Stone Design's alleged misappropriation of the French formula, but instead extend globally to all of the Defendants' allegedly actionable conduct. *See Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C.*, 436 S.W.3d 9, 21 (Tex. App. – Houston [14th Dist.] 2014).

Additionally, both Morrison's opinions regarding lost profits and reasonable royalty reference Defendants' gross revenues. As noted above, in its second June 28 Order, the Magistrate Judge held Morrison is not qualified to testify regarding Defendants' profits, noting the "further removed a layman is from a company's day-to-day operations, the less likely it is that his opinion testimony will be admissible under Rule 701." Dkt. #225 at p. 41 (quoting *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 686 (5th Cir. 2003) (vacating damages award where plaintiff's witness had little significant actual knowledge about plaintiff and its operations, so witness could not provide lay opinion testimony)). According to the Magistrate Judge, although Morrison may have knowledge of

---

[30] Only those lost profits that can be shown with reasonable certainty by competent evidence may be recoverable as damages. *Naegeli Transp. v. Gulf Electroquip, Inc.*, 853 S.W.2d 737, 740 (Tex. App. 1993), *writ denied* (July 30, 1993) (citation omitted). The profits need not be susceptible to exact calculation; it is sufficient that the amount of loss is shown by competent evidence with a reasonable degree of certainty. *Naegeli,* 853 S.W.2d at 740 (citing *Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938); *General Supply and Equipment Co., Inc. v. Phillips,* 490 S.W.2d 913, 921 (Tex. App.—Tyler 1972, writ ref'd n.r.e.)).

StoneCoat's value or the alleged misappropriated information's value to StoneCoat, Morrison is "completely uninvolved with Defendants' day-to-day operations." Dkt. #225 at p. 41.

Estimation of damages should not be based on sheer speculation. If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable. *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986). Here, too few facts exist to permit the trier of fact to calculate proper damages. *Id*.

The Court determines Plaintiffs have failed to set forth evidence of the type of economic damages contemplated under the flexible approach taken to calculating damages in trade secrets misappropriation cases. The Court does, however, determine that Plaintiffs have established that a genuine dispute of material fact exists as to whether there has been actual misappropriation by Profanchik and/or ProCal Stone Design to entitle StoneCoat GP to injunctive relief. *See Windsor v. Olson*, No. 3:16-CV-934-L, 2019 WL 2080021, at *20 (N.D. Tex. May 10, 2019) (citing TEX. CIV. PRAC. & REM. CODE § 134A.003(a) ("Actual or threatened misappropriation may be enjoined[.]"); also citing 18 U.S.C. § 1836(b)(3)(A)(i) ("[A] court may grant an injunction to prevent any actual or threatened misappropriation[.]")).

With the exception of StoneCoat GP's trade secret misappropriation claim against Profanchik and ProCal Stone Design for misappropriation of the French formula which may entitle StoneCoat GP to injunctive relief, the Court grants summary judgment as to Plaintiffs' remaining trade secret misappropriation claims.

*Plaintiffs' claims against Kinser, Villarreal, and Gonzalez for breach of their non-compete agreements*

Plaintiffs object to the Magistrate Judge's recommendation regarding their breach of contract claims against Kinser, Villarreal, and Gonzalez. Dkt/ #265 at pp. 22-25. Specifically, Plaintiffs object to the Magistrate Judge's findings that the restrictions contained in the non-compete agreements are broader than necessary to protect StoneCoat's business interests and that the scope of the non-compete agreements is impermissibly broad, especially considering the five-year time restriction and the fact there is no geographical limitation or acceptable substitute in the provisions. Dkt. #241 at p. 174. The Magistrate Judge further found reformation is unwarranted. *Id*. at pp. 176-77.

A non-compete covenant is in restraint of trade and therefore unenforceable on public policy grounds unless it is reasonable. *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 701 (W.D. Tex. 2019) (citation omitted). The restraint "must not be greater than necessary to protect the promissee's legitimate interest." *Id.* Accordingly, the restrictions in a non-compete covenant—geographic restrictions, duration, and scope—must all be reasonable. *Id.*

According to Plaintiffs, the scope of the non-compete contracts is reasonable because it protects the business interest and goodwill of StoneCoat. Dkt. #265 at p. 23. However, Plaintiffs fail to address the reasonableness of the five year period in the non-compete provision, which is on the far end of what Texas courts have found reasonable. Nor do Plaintiffs even attempt to argue in their objections how the non-compete provision is reasonable even though it contained no geographical limitation. The Court has previously noted Texas courts have struck down covenants not to compete for failure to include a geographic limitation under Tex. Bus. & Com. Code §

15.50(a). Weber Aircraft, L.L.C. v. Krishnamurthy, No. 4:12-CV-666, 2014 WL 12521297, at *7 (E.D. Tex. Jan. 27, 2014), *report and recommendation adopted sub nom. Weber Aircraft v. Krishnamurthy*, No. 4:12-CV-00666-RC-ALM, 2014 WL 4536594 (E.D. Tex. July 29, 2014) (citing *Goodin v. Jolliff*, 257 S.W.3d 341, 351-52 (Tex. App. – Fort Worth 2008, no pet.); also citing *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 663 (Tex. 1990)).

Plaintiffs' objections are nothing more than a regurgitation of their arguments raised before, and rejected by, the Magistrate Judge. The Court has conducted a *de novo* review of the objections in relation to the evidence outlined in detail by the Magistrate Judge and the applicable law and agrees with the Magistrate Judge the restrictions in the non-compete agreements are not reasonable. The Court further agrees with the Magistrate Judge that reformation is not warranted. The Court grants Kinser's and Villarreal/Gonzalez's motions for summary judgment regarding Plaintiffs' breach of contract claims against them.

### Plaintiffs' conspiracy claims

Under Texas law, a claim of civil conspiracy requires the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, No. 3:15-CV-4108-D, 2017 WL 635031, at *13 (N.D. Tex. Feb. 16, 2017) (quoting *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) (quoting *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (internal quotation marks omitted))). To satisfy the "meeting of the minds" element, Plaintiffs must allege the defendants had the "specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."

*Samsung*, 2017 WL 635031, at *13 (quoting *Wackman*, 602 F.3d at 408 (quoting *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)) (internal quotation marks omitted)). Plaintiffs can establish intent by "circumstantial evidence and reasonable inference." Samsung, 2017 WL 635031, at *13 (quoting *Wackman*, 602 F.3d at 409 (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968))).

Conspiracy is a derivative tort because "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC, 437 S.W.3d 917, 920 (Tex. App. – Dallas 2014, pet. denied) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996)). Aiding and abetting similarly requires proving an underlying, specific-intent tort or grossly negligent act. *Macias v. Gomez*, No. 13-14-00139-CV, 2014 WL 7011372, at *4 (Tex. App. – Corpus Christi-Edinburg Dec. 11, 2014) (citing *W. Fork Advisors,* 437 S.W.3d at 921 (citing *Ernst & Young, LLP. v. Pac Mut. Life Ins. Co.,* 51 S.W.3d 573, 583 (Tex.2001) (holding that summary judgment on the underlying tort claim disposed of plaintiffs civil conspiracy and aiding and abetting claims))).

The conspiracy claims against Profanchik and ProCal Stone Design regarding their alleged misappropriation of the French formula remain. However, viewing the evidence of record in the light most favorable to Plaintiffs, Plaintiffs have failed to raise a fact issue on whether Defendants conspired to misappropriate the French formula. The evidence is insufficient to create a genuine issue of material fact that Defendants acted in concert to achieve an unlawful means. For that reason, Plaintiffs have not presented sufficient evidence to withstand summary judgment on a conspiracy claim which arises from trade secret misappropriation. Thus, the Court finds Plaintiffs' remaining

objections as to their civil conspiracy claims are also without merit and are, therefore, overruled.

## CONCLUSION

The Court has made a *de novo* review of the objections and is of the opinion that with the exception of StoneCoat GP's trade secret misappropriation claim against Profanchik and ProCal Stone Design for misappropriation of the French formula, which may entitle StoneCoat GP injunctive relief, the findings and conclusions of the Magistrate Judge are correct and the objections are without merit as to the remaining findings of the Magistrate Judge. Accordingly, it is hereby

**ORDERED** that John Profanchik, Sr.'s Motion for Summary Judgment (regarding StoneCoat GP's and StoneCoat LP's remaining claims against him) (Dkt. #67) and ProCal Stone Design, LLC's Motion for Summary Judgment (Dkt. #129) are **GRANTED IN PART and DENIED IN PART**. It is further

**ORDERED** that with the exception of StoneCoat GP's trade secret misappropriation claim against Profanchik and ProCal Stone Design for misappropriation of the French formula which may entitle StoneCoat GP to injunctive relief, StoneCoat GP's and StoneCoat LP's remaining claims against John Profanchik, Sr. and Plaintiffs' remaining claims against ProCal Stone Design are **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** that Irma Villarreal and Alfredo Gonzalez's Motion for Summary Judgment (Dkt. #127); Justin Kinser's Motion for Summary Judgment (Dkt. #128); and ProCal Stone Design USA, LLC and ProCal Enterprises, LLC's Motion for Summary Judgment (Dkt. #195) are **GRANTED**.  It is further

**ORDERED** Plaintiffs' claims against Irma Villarreal, Alfredo Gonzalez, Justin Kinser,

ProCal Stone Design USA, LLC, and ProCal Enterprises, LLC are **DISMISSED WITH PREJUDICE**.

    **SIGNED this 12th day of September, 2019.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE